PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1854
_____

ALBERT FLORA, JR.,
                              Appellant

v.

COUNTY OF LUZERNE and ROBERT C. LAWTON,
County Manager, in his official capacity
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-13-cv-1049)
District Judges:  Hon. Malachy E. Mannion
_____

Argued
November 18, 2014

Before:  RENDELL, JORDAN, and NYGAARD, *Circuit
Judges*.

(Filed: January 15, 2015)
_____

Katherine U. Davis
Vernon L. Francis
Dechert
2929 Arch Street – 18ᵗʰ Fl.
Philadelphia, PA   19104

Mary Catherine Roper     [ARGUED]
American Civil Liberties Union of Pennsylvania
P. O. Box 40008
Philadelphia, PA   19106

Michelle H. Yeary
Dechert
902 Carnegie Center – Ste. 500
Princeton, NJ   08540
        *Counsel for Appellant*

John G. Dean
Elliott Greenleaf & Dean
201 Penn Avenue – Ste. 202
Scranton, PA   18503

Deborah H. Simon   [ARGUED]
Elliott Greenleaf & Siedzikowski
925 Harvest Dr. – Ste. 300
Blue Bell, PA   18422
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Appellant, Albert Flora, Jr., the former Chief Public Defender for Luzerne County, Pennsylvania, challenges the order of the United States District Court for the Middle District of Pennsylvania dismissing his First Amendment retaliation claims against the County and its manager, Roger Lawton. Because the District Court applied an incorrect standard in determining whether the facts alleged in the complaint set forth a claim for relief, and because, under the Supreme Court's recent decision in *Lane v. Franks*, __ U.S. ____, 134 S. Ct. 2369 (2014), Flora pled facts sufficient to allege that he spoke as a citizen, we will vacate the District Court's order and remand for further proceedings.

## I.    Background[1]

Flora worked for the Luzerne County Office of the Public Defender from 1980 until 2013. He became the First Assistant Defender in 1990 and the Acting Chief Public Defender in March 2010. Three months later, the Luzerne County Board of Commissioners ("the Commissioners") appointed him as the Chief Public Defender. He also maintained a private criminal defense practice during his tenure with the Public Defender's Office.

---

[1] Because we are reviewing the grant of a motion to dismiss, we recount the facts as alleged by the non-movant, Flora, accepting them as true and construing them in the light most favorable to him. *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co.*, 677 F.3d 178, 182 (3d Cir. 2012).

The Public Defender's Office is charged with providing representation to indigent criminal defendants in 17 magisterial districts, the Luzerne County Court of Common Pleas, and the appellate courts of Pennsylvania. It also provides representation in state and county parole, probation, and civil commitment proceedings. When Flora became the Chief Public Defender, the office was "plagued with problems as a result of years of insufficient funding." (Appellant's Br. at 3; *see also* App. at 11.) His predecessor had tried to secure additional funding from Luzerne County by submitting weekly reports to the Commissioners that detailed the excessive caseloads and staffing deficiencies. To improve the quality of representation for juveniles, Flora sought and obtained grant funding from the Pennsylvania Commission on Crime and Delinquency and the Luzerne-Wyoming Counties Mental Health Program. He was not, however, able to obtain additional money to address the funding crisis as it pertained to adult offenders. Flora provided the County, the Commissioners, and Lawton with a report in June 2010 that detailed funding inadequacies and stated that the current level of resources did not allow the Public Defender's Office to provide constitutionally adequate representation to its clients. The County was unresponsive to Flora's concerns, so he restricted the types of clients that the Office would represent, refusing representation to those who were not faced with a period of incarceration if convicted.

Flora continued battling the County on funding, submitting his 2012 budget "under protest" and stating that "[c]urrent staffing levels and existing caseloads[] prevent this office from providing the level of representation required by ethical standards and by Federal and State Constitutions ... .

[T]he office is ethically required to withdraw from existing cases or refuse new cases." (App. at 47.) By April 2012, insufficient funding coupled with a hiring freeze and several attorney resignations meant that the resource issue had reached a critical stage.[2] Flora thus decided to initiate a class action lawsuit for the benefit of indigent criminal defendants. With three clients of the Public Defender's Office as the named plaintiffs in the suit, he filed a complaint in the Luzerne County Court of Common Pleas on April 10, 2012, and petitioned for a writ of mandamus compelling the County to provide adequate funding, office space, and attorney staffing. That same day, he filed a federal court complaint and a motion for a preliminary injunction, seeking an order to prevent the County from firing him for his actions. *Flora v. Luzerne Cnty.*, No. 12-665 (M.D. Pa. filed Apr. 10, 2012). Rather than litigate the federal claim, the parties entered into a stipulation allowing Flora to remain Chief Public Defender.

On June 15, 2012, the state court granted Flora's petition for mandamus. It ordered the County to provide adequate funding and staffing to the Public Defender's Office,[3] and it further ordered the parties into mediation and

---

[2] Flora's complaint suggests that the attorneys resigned due to unreasonable workloads, inadequate funding, and the ethical quandaries those issues created.

[3] The County appears to have confined its entire defense of the state court funding action to arguing that the statute requiring the County to provide a public defender mandated only that the County have an individual titled "Public Defender" and not that it staff the public defender's office or provide it with any funding.

prohibited the Public Defender's Office from refusing representation to any indigent defendants. On December 19, 2012, while the parties were in mediation, the County Council approved an amendment to the Public Defender's budget to add a full-time Chief Public Defender position and to maintain a part-time Assistant Public Defender.[4] Three months later, Flora and other candidates interviewed with a panel of representatives from the County government for the Chief Public Defender position, with Flora and two others receiving the panel's recommendation for further consideration.

Meanwhile, the funding litigation Flora had instituted in state court was unfolding amidst the fallout from the "Kids for Cash" scandal. Between 2003 and 2008, approximately 50% of juvenile offenders in Luzerne County appeared in court without the benefit of counsel – about ten times the state average. Virtually all were adjudicated delinquent. Eventually, federal investigators uncovered a scheme in which two Luzerne County Common Pleas judges had been accepting kickbacks from for-profit juvenile detention facilities in exchange for sending unrepresented juvenile defendants to those facilities. The Pennsylvania Supreme

---

[4] After creating the new full-time public defender position, the County petitioned the state court to end the mediation and also answered the federal complaint that Flora had filed, alleging that it was moot. Flora responded by voluntarily dismissing his federal complaint. *Flora v. Luzerne Cnty.*, No. 12-665 (M.D. Pa. dismissed Mar. 11, 2013).

Court responded to these revelations by appointing a Special Master – Senior Judge Arthur Grim of the Bucks County Court of Common Pleas – to recommend ameliorative measures. Based on Judge Grim's report and recommendation, the Supreme Court in 2009 ordered the vacatur and expungement of thousands of delinquency adjudications and consent decrees. Notwithstanding the Supreme Court's order, Flora alleges that, in early 2013, during a routine meeting with court administrative staff, he learned that over 3,000 of the adjudications and decrees had not yet been expunged. He then brought that failure to the attention of the County, the District Attorney for the County, the Administrator of the Court of Common Pleas, the public interest law firm that represented the juveniles in the expungement proceedings, and Judge Grim. Lawton, who, as previously noted, was the County Manager, was angry that Flora had reported the expungement issue to Judge Grim, even though Flora explained that, "as an officer of the Court," he felt compelled to do so.

Lawton interviewed Flora for the Chief Public Defender position in March 2013, but ultimately recommended – and the Commissioners approved – a different attorney, Steven Greenwald. As the County hired Greenwald, one Commissioner informed the media that Flora was a "controversial" candidate because of the funding lawsuit. Flora had been scheduled to stay in office until April 29, 2013, but on April 17, 2013, Lawton informed him that he was relieved of all duties as Chief Public Defender.

A few days later, Flora filed the present action, alleging that he had been terminated from his position as Chief Public Defender in retaliation for his efforts to secure

7

funding for the Office of the Public Defender and for reporting the County's noncompliance with the Pennsylvania Supreme Court's expungement order. He asserted claims under 42 U.S.C. § 1983 based on a theory of First Amendment retaliation,[5] and he also included in his

_____

[5] Section 1983 is the vehicle public employees use to bring claims that their First and Fourteenth Amendment rights have been violated. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). The County and Lawton argue for the first time on appeal that Flora's complaint did not contain a § 1983 First Amendment claim based on his reporting about the juvenile expungements. While it is true that Count I of the complaint describes only the filing of the state court action, the complaint makes numerous references to the expungement issue as a factor in Flora's dismissal, and Count I of the complaint contains an incorporation-by-reference paragraph which sweeps in those earlier allegations regarding the expungement issue. Moreover, in their motion to dismiss, the County and Lawton acknowledged the existence of Flora's claim with respect to the expungement report, and they expressly argued that Flora could not state a First Amendment retaliation claim based on that issue. In short, that claim was contained, and understood by all to be contained, in Flora's complaint. *See Rosenthal v. Rizzo*, 555 F.2d 390, 392 n.2 (3d Cir. 1977) ("[T]he amended complaint expressly declared that Plaintiff realleges and incorporates by reference herein paragraphs 1-27, and 29-36 ... . Thus, the crucial paragraph 10 was realleged.") (internal quotation marks omitted); *see also Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 300 (3d Cir. 2005) ("These allegations, which are incorporated by reference in every count of the

complaint state-law wrongful termination and Whistleblower Act claims. He sought an order restoring him to the Chief Public Defender position but did not seek monetary damages.

The District Court dismissed Flora's complaint, concluding that he had failed to state a First Amendment claim because the filing of the state court action and the reporting of unfinished expungements "related to" his official duties as Chief Public Defender and thus, under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), were not protected by the First Amendment. (App. at 3-31.) After dismissing Flora's only federal claim, the District Court declined to exercise supplemental jurisdiction over his state law claims. This appeal followed.[6]

---

complaint, readily satisfy the misrepresentation requirement … .").

[6] The District Court dismissed the state law claims without prejudice to Flora's refiling them in state court, which Flora did on on April 9, 2014. *Flora v. Luzerne Cnty.*, No. 2014-4731 (Ct. C.P. Luzerne Cnty. filed Apr. 9, 2014).

9

## II.    Discussion[7]

Public employees do not renounce their First Amendment rights upon employment; however, "the government's countervailing interest in controlling the operation of its workplaces" limits the First Amendment's ordinarily broad protections. *Lane*, 134 S. Ct. at 2377 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

To establish a First Amendment retaliation claim, a public employee must show that his speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action. *See Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009). If the employee establishes both of those predicates, the burden shifts to the employer to show that it would have taken the same action even if the speech had not occurred. *Id*. In this case, the second predicate was in effect conceded for purposes of the motion to dismiss,[8] so the only

___

[7] The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo a dismissal under Rule 12(b)(6). *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008).

[8] The County and Lawton failed to include any argument on their motivations in their 12(b)(6) motion, and thus they conceded the issue for the purposes of that motion and this appeal. *Delaware Nation v. Pennsylvania*, 446 F.3d 410, 416 & n.9 (3d Cir. 2006), *as amended* (June 14, 2006) ("Although [the plaintiff] now contends that it did not *concede* the argument … , it does not, and cannot, argue that

10

issue before us is whether Flora's speech was protected by the First Amendment.

A public employee's statement is protected by the First Amendment when: "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting *Garcetti*, 547 U.S. at 418). At present, the parties dispute only whether Flora was speaking as a citizen or as an employee of the Public Defender's Office when he spoke out through the funding lawsuit and through his report about incomplete expungements. In other words, the survival of the case comes down to whether that speech was within Flora's job duties. *See Lane*, 134 S.Ct. at 2379 (noting that the key question in

_____

it *raised* the issue before the District Court. Therefore, the issue is waived." (internal citation omitted)). Insofar as they attempted to introduce in their factual background portion of their briefing before the District Court a dispute about their motivations in refusing to hire Flora, the District Court properly rejected their efforts as raising matters outside the pleadings and therefore being inappropriate in a motion to dismiss. (App. at 5 n.1 ("The court notes that the defendants have relied on materials outside of the pleadings in support of the factual background set forth in their motion to dismiss. In accordance with the standard for considering a motion to dismiss, the court has not considered the outside materials in deciding the defendants' pending motion.").)

11

the citizen speech analysis is "whether the speech at issue is itself ordinarily within the scope of an employee's duties.").

### A. Factual Dispute

"'Whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law.'" *Dougherty v. Sch. Dist. of Phila.*, ___ F.3d ____, No. 13-3868, 2014 WL 6600421, at *5 (3d Cir. Nov. 21, 2014) (brackets omitted) (quoting *Foraker v. Chaffinch,* 501 F.3d 231, 240 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, ___ U.S. ____,131 S. Ct. 2488 (2011)). Specifically, the scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1058 (9th Cir. 2013).

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a district court must accept all facts alleged in the complaint as true and construe the complaint in the light most favorable to the nonmoving party. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The district court may not make findings of fact and, insofar as there is a factual dispute, the court may not resolve it. *See Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011), *as amended* (Oct. 7, 2011) (district court is not permitted to make independent findings of fact when deciding a Rule 12(b)(6) motion). Here, there was a factual dispute as to whether Flora's job

duties encompassed making the statements at issue.[9] Rather than accepting the facts alleged in the complaint as true, the District Court in effect made factual determinations as to the scope of Flora's duties.[10] In doing so, it erred. *See Andrew v.*

[9] That such a dispute exists at this stage does not mean that one will, after discovery, remain for trial, and we do not imply that summary judgment will necessarily be inappropriate. That is a question left for the District Court after development of the record.

[10] For example, in his complaint, Flora makes the following allegations: that the funding issue had reached a "crisis stage" (App. at 39); that his duties included "managing the OPD: overseeing its lawyers and employees, establishing its policies, managing its budget, and ensuring its compliance with constitutional, statutory, and professional/ethical guidelines" (App. at 40); that he was statutorily obligated only to "provide representation to indigent criminal defendants where constitutionally mandated" (App. at 41); that he normally obtained funding by applying for grants (App. at 44) and petitioning the Commissioners (App. at 45-48); that he "ha[d] done everything that he could do without additional resources to improve the functioning of the adult unit of the OPD and the services it provides to indigent defendants" before turning to extraordinary measures (App. at 50); that he juxtaposed the lawsuit with "work[ing] within the County's procedures to obtain proper funding and staffing for the OPD" (App. at 51); that Lawton was angry he had gone outside the chain of command in reporting the failure to complete the expungements (App. at 55); and that Flora believed that he was obligated as "an Officer of the Court" to report the issue (App. at 55). Rather than accepting these

allegations as true, the District Court made independent findings as to disputed facts. (*See* App. at 29 ("[T]he court finds that [Flora] pursuant to his duties as the Chief Public Defender, took these actions and, as such, was acting as a government employee, not a private citizen."); App. at 28-29 ("From the record before the court, there is no indication that [Flora] was acting as a citizen when he attempted to obtain additional funding for the OPD or took steps to remedy the failure of court administrative staff to expunge juvenile records as ordered by the court. [Flora] was performing some of the very tasks for which he was hired ... ."); App. at 27 ("As it is the public defender and not the average citizen that has the obligation to ensure that eligible criminal defendants are provided adequate legal representation ... , the plaintiff could not have filed the state court action in any other capacity than as that of the Chief Public Defender and clearly his actions in doing so related to his duties as the Chief Public Defender."); App. at 28 (concluding that, because Flora alleged he learned of the failed expungements during a "routine" meeting, he was "'routinely' involved in overseeing the proper docketing of juvenile matters" and thus that "[Flora] was acting in his capacity as, and pursuant to his official duties as, the Chief Public Defender"); App. at 29 (concluding that Flora's actions were pursuant to his official duties because "[he] indicates in his motion for a preliminary injunction that the defendants had no legitimate interest 'in preventing the Chief Public Defender [not Al Flora, Jr., as a citizen] from taking every lawful step necessary'") (alteration in original); App. at 29 ("It is not the average citizen who would file a state court funding action in order to ensure that the OPD had adequate funding to provide indigent criminal defendants with adequate representation.").)

14

*Clark*, 561 F.3d 261, 267 (4th Cir. 2009) ("[T]he question whether [a memorandum] was written as part of [the plaintiff's] official duties was a disputed issue of material fact that cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6).").

### B. Citizen Speech

That error was compounded by the District Court's application of an incorrect legal standard to the facts it had improperly found. In determining whether Flora's job duties encompassed the statements at issue, the District Court identified the relevant legal question as whether Flora's filing the state court lawsuit and reporting the inadequate progress on expungements "related to" his job duties. (App. at 25.) That approach misapprehends the question posed by *Garcetti*.

The Supreme Court's opinion in *Garcetti* sets forth the controlling test for determining whether a public employee's speech was made incident to his employment duties: "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. In *Garcetti*, a deputy district attorney wrote a dispositional memorandum, in which he recommended dismissing a prosecution based on an improper search warrant affidavit. *Id.* at 414-15. The district court concluded that, because the statements were made pursuant to his official job duties, they were not protected speech. *Id.* at 415. The United States Court of Appeals for the Ninth Circuit reversed, holding that the speech was inherently a matter of public concern and that it did not unduly disrupt the operations of

15

the District Attorney's Office. *Id.* at 415-16. The Supreme Court in turn reversed the court of appeals and held that courts must first inquire as to whether an employee spoke as a citizen or in his role as an employee. *Id.* at 418. The Court expressly recognized that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 417. The Court also stressed that, whether the speech at issue "concern[s] the subject matter of [the speaker's] employment" is "nondispositive," because the First Amendment "protects some expressions related to the speaker's job." *Id.* at 421. Instead, the "controlling factor" is whether the statements were "made pursuant to [the speaking employee's] duties," that is, whether such utterances were among the things that the employee "was employed to do." *Id.* at 421. The *Garcetti* Court did not advance a framework for defining when an employee speaks pursuant to his official duties. *Id.* at 424. It did, however, condemn reliance on "excessively broad job descriptions. " *Id.* at 424-25. And, it cautioned against a focus on formal job descriptions because "[t]he proper inquiry is a practical one." *Id.*

We, too, have forgone any attempt to create a comprehensive framework for determining whether speech is made pursuant to an employee's official job duties. *Dougherty*, 2014 WL 6600421, at \*6. We have, rather, attempted to "give[] contours to *Garcetti*'s practical inquiry." *Id.* (internal citations omitted). For example, in *Foraker v. Chaffich*, we declined to extend First Amendment protection when the speech in question was directed "up the chain of command." 501 F.3d at 241-43 (holding that police officers' statements concerning hazardous conditions at a firing range were made pursuant to their official duties since they were

16

obligated to report that type of information up the chain of command), *abrogated on other grounds by Guarnieri*, 131 S. Ct. at 2488. In *Gorum v. Sessoms*, we held that a professor who spoke on behalf of a student at a disciplinary hearing was speaking pursuant to his official duties when he was a "de facto" advisor to students on disciplinary matters. 561 F.3d at 186.

The County and Lawton rely on our statement that a "claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job," *Foraker*, 501 F.3d at 240; *accord Gorum*, 561 F.3d at 185. They contend that because the speech here relates to special knowledge Flora obtained as Chief Public Defender – in essence that it owes its existence to Flora's job duties – it was not citizen speech. (Appellees' Br. at 15-16, 19.) *Foraker* and *Gorum*, however, considered how the employee learned of the information as only one non-dispositive factor among many. Indeed,

> [we have] never applied the "owes its existence to" test ... and for good reason: this nearly all-inclusive standard would eviscerate citizen speech by public employees simply because they learned the information in the course of their employment, which is at odds with the delicate balancing and policy rationales underlying *Garcetti*.
>
> To this end, it bears emphasis that whether an employee's speech "concern[s] the subject matter of [his] employment" is "nondispositive" under *Garcetti*. 547 U.S. at 421. This is because

17

the First Amendment necessarily "protects some expressions related to the speaker's job." *Id.* In fact, as the Supreme Court recently reiterated, speech by public employees "holds special value *precisely because* those employees gain knowledge of matters of public concern through their employment." *Lane*, 134 S. Ct. at 2379 (emphasis added) … .

*Dougherty*, 2014 WL 6600421, at *7.

In *Lane*, the Supreme Court clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself *ordinarily* within the scope of an employee's duties, not whether it merely concerns those duties." 134 S. Ct. at 2379 (emphasis added). The Court held that a public employee could not be terminated for providing to a grand jury truthful, sworn testimony under subpoena, even though the testimony concerned matters related to the employee's job. *Id.* at 2378-79. According to the Court, the term "official responsibilities," means the responsibilities an employee undertook when he "went to work and performed the tasks he was paid to perform," which did not, in that case, encompass testifying in legal proceedings. *Id.* (internal quotation marks omitted). And, the Court cautioned, there is "considerable value" in "encouraging, rather than inhibiting, speech by public employees. For, [they] are often in the best position to know what ails the agencies for which they work." *Id.* at 2377 (internal quotation marks omitted). The Court therefore concluded that giving grand jury testimony was not part of that employee's "*ordinary* job responsibilities" even though the testimony "relate[d] to [the employee's] public

18

employment or concern[ed] information learned during that employment." *Id.* at 2378 (emphasis added).

Further, in *Dougherty v. School District of Philadelphia*, we had occasion to consider the implications of *Lane* for a School District employee who was terminated after saying to *The Philadelphia Inquirer* that the District Superintendent had improperly skirted competitive bidding rules and steered a lucrative contract to a personal acquaintance. 2014 WL 6600421 at *1. We ruled that the employee spoke as a citizen rather than pursuant to his official duties, even though he oversaw the school district's procurement program and learned of the alleged misconduct in that role. *Id.* at *5-7. We further decided that, because the employee's "routine job responsibilities" did not include reporting misconduct to the press or to the school board, his speech was not within the scope of his employment "merely because the subject matter of the speech concern[ed] or relate[d] to those duties." *Id.* at *7, *9. While it was not necessary to our conclusion, we noted that "*Lane* may broaden *Garcetti*'s holding by including 'ordinary' as a modifier to the scope of an employee's job duties." *Id.* at *9.

Here, the District Court identified the relevant question as whether Flora's actions "related to" his job duties. (App. at 26.) It then held that, because Flora's statements did "relate[]" to his role as the Chief Public Defender, they were not citizen speech and were unprotected. (App. at 26-29.) In thus using the "related to" standard, the District Court did not apply the correct test under *Garcetti*, as *Lane* has made clear. *Lane*, 134 S. Ct. at 2379 ("*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment.").

19

In particular, the Supreme Court in *Garcetti* said that "[t]he First Amendment protects some expressions *related to* the speaker's job." *Garcetti*, 547 U.S. at 421 (emphasis added). The decision to dismiss Flora's complaint is thus at odds with controlling precedent. While the District Court did not have the benefit of *Lane* and *Dougherty* when it ruled, *Garcetti* alone should have steered it away from applying the "related to" standard. With the further light that *Lane* and *Dougherty* provide, the proper framing of the question is whether the filing of the state court funding suit and the reporting of the failure to finish the expungements were within Flora's ordinary job duties as the Chief Public Defender, not whether they concerned or were related to those duties. *Lane*, 134 S. Ct. at 2379.

Because the District Court's decision rests on an errant reading of *Garcetti* and is at odds with *Lane* and *Dougherty*, it cannot stand. We need not decide whether *Lane* modified or merely clarified *Garcetti*.[11]  Because *Lane* now controls,

---

[11] *Lane* introduced the word "ordinary" to modify "job duties" in the First Amendment retaliation test. Some courts have speculated whether this new adjective signals a shift in the law that broadens the scope of First Amendment protection for public employees. *See, e.g.*, *Mpoy v. Rhee*, 758 F.3d 285, 295 (D.C. Cir. 2014) ("In particular, the use of the adjective ordinary – which the court repeated nine times – could signal a narrowing of the realm of employee speech left unprotected by *Garcetti*.  Neither *Garcetti* nor any other previous Supreme Court case had added ordinary as a qualifier."); *Hagan v. City of New York*, ___ F. Supp. 2d ___, No. 13-1108, 2014 WL 4058067, at *21 (S.D.N.Y. Aug. 15, 2014) ("After *Lane*, the focus is on her ordinary job

*cf. Perez v. Dana Corp., Parish Frame Div.*, 718 F.2d 581, 584 (3d Cir. 1983) ("As a general rule an appellate court must apply the law in effect at the time it renders its decision."), the responsibility of a district court in evaluating whether a public employee's speech was made as a private citizen is to ask whether the speech at issue was "outside the scope of his ordinary job responsibilities." *Id.* at 2378.

### C.    *Applying* Lane *to Flora's Complaint*

Against that legal backdrop, we consider the viability of Flora's complaint.[12]  If the facts alleged are taken as true and construed in the light most favorable to Flora, the complaint contains sufficient factual allegations to plausibly establish that Flora's statements were not made pursuant to

responsibilities.").  Flora argues that *Lane* merely clarified the *Garcetti* holding and does not represent any shift in the law. In *Dougherty*, we expressly declined to resolve that question because, on those facts, we did not need to do so.  2014 WL 6600421 at *9.  Likewise, here, we do not need to decide whether *Lane* represents more than a clarification of existing law.   Due to the relief Flora is seeking, there is no qualified immunity determination to be made, so we can leave for another day the ramifications of deciding whether *Lane* constitutes new law.

[12] Because this case presents a purely legal issue – the facts having to be accepted as alleged at the motion-to-dismiss stage – we apply *Lane* in the first instance rather than remanding for the District Court to do so.

21

his ordinary job responsibilities.[13] Flora's complaint does concede some ground. It includes allegations that, as the Chief Public Defender, he was responsible for his office's representation of its clients and that he was terminated for enforcing those clients' rights. He also alleges that he learned about both the funding crisis and the expungement issue in the course of his job duties. But Flora also alleges that, when channeling his speech "up the chain of command" failed to produce results, he took drastic measures by filing the funding lawsuit against the County and by reporting the unfinished expungements.[14] *Foraker*, 501 F.3d at 237-38.

---

[13] Again, Lawton and the County have not challenged that the statements touched on a matter of public concern or that the County lacked an adequate justification for treating Flora differently than other citizens, nor did they argue that the statements were not a substantial or motivating factor in prompting his discharge. Thus, at this stage in the litigation, we need not address those issues.

[14] While Flora's institution of the funding lawsuit and reporting of the failure to finish the expungements may be construed as conduct, our precedent holds that verbal and written communications do not become conduct, rather than speech, merely because they happen to serve a certain function or serve as a vehicle for some other purpose. *King v. Governor of N.J.*, 767 F.3d 216, 225 (3d Cir. 2014); *accord Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). We are not asked to and we do not undertake to consider whether Flora's lawsuit should be considered under the petition clause of the First Amendment. *Cf. Guarnieri*, 131 S. Ct. at 2494 (public employee whose speech consists of

He further alleges that his obligations as an attorney, rather than as the Chief Public Defender, compelled him to make the statements at issue. Finally, he describes both the funding crisis and the expungement issue as extraordinary circumstances impelling him to extraordinary speech.

A straightforward application of *Lane* leads us to conclude that, given those allegations, Flora's speech with respect to both the funding litigation and the expungement problems was not part of his ordinary responsibilities – it was not part of the work he was paid to perform on an ordinary basis. 134 S. Ct. at 2378-79. As claimed in his complaint, and as described in the statute creating the Public Defender, Flora's ordinary job duties did not include the public reporting of lingering effects from government corruption or the filing of a class action suit to compel adequate funding for his office. Rather, he represented indigent clients in criminal court and in related proceedings. Lawton and the County contend that, because Flora alleges his speech was partially aimed at vindicating the rights of indigent criminal defendants, he has conceded that it was within the scope of his ordinary job duties. But, their argument sweeps too broadly. While certain statements in Flora's complaint do suggest that the speech at issue bore some relation to his job duties and may have, indirectly, benefitted his clients, that does not bring the speech within the realm of his ordinary job duties. *Cf. Pickering*, 391 U.S. at 568 (teacher who reported funding deficiency was speaking as a citizen rather than as a teacher even though additional funding would have facilitated teacher's education of students); *Dougherty*, 2014 WL

instituting a lawsuit may bring retaliation claim either under speech or petition clause of First Amendment).

23

6600421 at *7, *9 (procurement director reporting superintendent's failure to abide by procurement policies was speaking as citizen even though absence of wrongdoing would arguably facilitate procurement office operations). To view it otherwise would unduly restrict First Amendment rights, because reporting malfeasance or misfeasance will regularly benefit an employee in the execution of his job duties by, presumably, removing impediments to proper government functioning.

Accordingly, we conclude that Flora's complaint contains sufficient allegations that his ordinary job duties did not include filing the funding suit or reporting the expungement issue and the pleading should therefore have survived the motion to dismiss. Whether Flora's ordinary job duties actually encompassed such tasks is an issue that may need to be resolved later in the case.

## III.    Conclusion

For the forgoing reasons, we will vacate the order of dismissal and remand for further proceedings.[15]

---

[15] As the issue of remedy is not before us, we make no ruling regarding the propriety of the remedy that Flora seeks, but we note that care is in order in assessing it. *See, e.g.*, *Selgas v. Am. Airlines, Inc.*, 104 F.3d 9, 12 (1st Cir. 1997) (noting that reinstatement may not be an available remedy if it requires bumping or displacing an innocent employee in favor of the plaintiff who would have held the job but for illegal discrimination); *Squires v. Bonser*, 54 F.3d 168, 173 & n.8 (3d Cir. 1995) (recognizing that reinstatement may not always be practical); *Ray v. Iuka Special Mun. Separate Sch.*

24

*Dist.*, 51 F.3d 1246, 1254 (5th Cir. 1995) (holding that district court did not abuse its discretion in denying reinstatement where there were no existing vacancies in school district and where reinstating plaintiff would require displacement of an existing employee).