**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1038-18T1

TROY BESSLER,

    Plaintiff-Appellant,

v.

COUNTY OF MORRIS,
MORRIS COUNTY SHERIFF'S
DEPARTMENT, FRANK
CORRENTE, and JOHN
KOWALSKI,

    Defendants-Respondents.

_____

Argued telephonically March 26, 2020 –
Decided May 28, 2020

Before Judges Whipple, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey, Law
Division, Sussex County, Docket No. L-0316-16.

Ashley V. Whitney argued the cause for appellant (Law
Offices of Gina Mendola Longarzo, LLC, attorneys;
Ashley V. Whitney, on the briefs).

Bryan P. Regan argued the cause for respondent County of Morris (Kaufman, Semeraro & Leibman, LLP, attorneys; Bryan P. Regan, on the brief).

John M. Bowens argued the cause for respondent Morris County Sheriff's Department (Schenck, Price, Smith & King, LLP, attorneys; John M. Bowens, on the brief).

John M. Barbarula argued the cause for respondent Frank Corrente (Barbarula Law Offices, attorneys; John M. Barbarula, on the brief).

Robert J. Greenbaum argued the cause for respondent John Kowalski.

PER CURIAM

Plaintiff Troy Bessler appeals from a September 19, 2018 order granting defendants County of Morris, Morris County Sheriff's Department, Frank Corrente, and John Kowalski summary judgment under the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2. We affirm.

In 1987, the Morris County Sheriff's Department hired plaintiff as a corrections officer for the Morris County Correctional Facility (jail). As a paramilitary organization, the jail has a very strict chain of command. The Morris County Sheriff's Office Bureau of Corrections Rules and Regulations[1]

---

[1] The Regulations are "[o]ffice mandates consisting of specific actions binding members . . . in terms of authority, responsibility, and conduct" under Regulation

defines the chain of command as the "unbroken line of authority" that extends from the sheriff, through the undersheriff, through the warden, through a captain, through a lieutenant, through a sergeant, and then to a corrections officer, and vice versa.

Individuals holding the titles set forth in the chain of command are "duly appointed sworn" persons referred to as "members" under Regulation 1:3.19. During normal day-to-day agency operations and when communicating a "matter of office business" to any supervisor, members are to maintain strict adherence to the chain of command, and "[i]n no event shall a member . . . evade his immediate supervising officer without the awareness and permission of said supervisor" under Regulations 2:5.13 and -14. Members may request permission to see the sheriff, undersheriff, or warden through their chain of command, but if the matter is "of a personal nature and does not involve the operations of the Morris County Sheriff's Office, the chain of command may be circumvented" under Regulation 2:5.14.

Plaintiff was promoted to sergeant in 2003, which, through the chain of command, reports directly to a lieutenant. According to the jail's organizational

---

1:3.35. Morris County Sheriff's Office, Bureau of Corrections, Rules and Regulations, (rev. March 2011).

A-1038-18T1

structure, a sergeant is to supervise officers, conduct tours of the facility, perform "supervisory and other assigned duties in accord with established policies, regulations, and procedures," and perform other related duties as required. Plaintiff was assigned as a control center sergeant, and then as a shift commander in the absence of a lieutenant, where his job was to supervise all actions occurring during that shift. One of his duties was to observe the jail from the monitors in the control center that received video feeds from the many cameras spread throughout the jail. His duties also included conducting tours of the jail to check for anything out of the ordinary and to make sure the facilities were secure, which took him through the jail's K-9 Unit kennel. When there were dogs in the kennel, he was not charged with caring for them, as that was the responsibility of the K-9 Unit.

In 2009, Frank Corrente became undersheriff, a position responsible for the day-to-day operations of the jail. At that time, Lieutenant John Kowalski was the administrative lieutenant, and was, according to plaintiff, under Corrente's "umbrella" and would feed Corrente information about those in Corrente's disfavor to target them for disciplinary action.

In late summer or fall of 2010, when plaintiff was working in the control center filling out forms on the computer, he overheard an officer say to another

4

officer "did you see him." Plaintiff asked what they were talking about, and they told him Corrente's dog was in the jail's kennel. Plaintiff looked at the monitor and saw an unfamiliar dog in the kennel run.

Plaintiff considered it an unlawful theft of services for Corrente to house his personal pet in the jail kennel. Because plaintiff "thought there was some illegal activity going on," he stated it was his "job to notify my superiors," and that "you're obligated, if you believe that there's something wrong, to report it." In fact, Regulation 2:1.28 states "[m]embers . . . knowing of other members or employees violating laws, ordinances, rules, regulations, policies or procedures of the [o]ffice, or disobeying orders, shall report the violation to their supervisor. The supervisor shall notify the [undersheriff] through the chain of command . . . ." Additionally, the "failure to take appropriate action on the occasion of a crime, disorder, or other act or condition deserving police attention and failure to perform duties associated with a current assignment" is neglect of duty under Regulation 1:3.22.

The Regulations further provide that "[t]he administrative delegation of the enforcement of certain laws and ordinances to particular units of the [o]ffice does not relieve members of other units from the responsibility of taking prompt, effective police action within the scope of those laws and ordinances when the

5

occasion so requires," under Regulation 2:1.6. Members are also not to "withhold any information concerning criminal activity, a law enforcement investigation or violation of rules, regulations, policies or procedures" under Regulation 2:1.27.

Within a couple of days of his discovery, plaintiff reported Corrente's personal use of the jail kennel to Lieutenant O'Brien. O'Brien showed plaintiff a memorandum that only allowed certain staff to go into the kennel and told plaintiff there was nothing he could do; O'Brien asserted he already reported it to Captain Pascale, O'Brien's direct supervisor in the chain of command, and was told to mind his own business. O'Brien testified in his deposition he considered his obligation fulfilled by reporting the matter to Pascale and did not feel he was required to do anything further.

During another shift, where plaintiff was on duty to tour the facility and check the back door of the kennel, he again saw Corrente's dog and reported it to Lieutenant Torkos, who was the shift commander that night. Torkos laughed and stated if he put his personal pet in the kennel he would be in prison. Plaintiff again saw Corrente's dog in the jail kennel around Thanksgiving 2010. At one point, an officer asked plaintiff what he was going to do about Corrente's dog; plaintiff told him he already did his part in reporting it to his lieutenant.

Over a course of years, plaintiff continued to see Corrente's dog in the jail kennel "[p]retty much every holiday," and said he continued to report it to whichever lieutenant was present that shift. However, he did not report it to Lieutenant Guida, who was in charge of the K-9 unit and would take care of Corrente's dog when it was at the jail. Other officers, lieutenants, and sergeants were also aware that Corrente's dog was often in the kennel, and some of them helped care for it.

While plaintiff did not know for certain that anyone reported his complaints about the dog to Corrente or to Kowalski, as no one ever told him they did or that Corrente or Kowalski knew of his complaints, plaintiff assumed the complaints went up the chain of command and asserted that November 2010, around the time of his first complaint about the dog, marked the beginning of a "campaign of harassment against" him.

Plaintiff asserts he was put under "undue scrutiny," and that Kowalski took it as a challenge to find a reason to discipline plaintiff, whom he had not yet written up since he had been there. Plaintiff contends his logbook entries were scrutinized, that Kowalski and Pascale watched him on the surveillance videos looking for reasons to discipline him, and that he was transferred to the midnight shift. Plaintiff further alleges he received three disciplinary charges

against him in retaliation for his reports: the first in January 2011 regarding an inmate extraction; the second in April 2011 involving alleged gossiping; and the third in January 2012 for removing photos from a surveillance video plaintiff said he did to protect himself by documenting Kowalski's intimidation tactics toward him. The first charge was sustained, the second charge was dismissed, and the third charge resulted in a twenty-five day suspension, with a warning from the hearing officer that if plaintiff was subjected to further discipline, a demotion or termination would be considered at that time. Plaintiff asserts that during this time he told O'Brien and Torkos he was being targeted, but he did not ask them to take any action.

In July 2012, plaintiff took a photo of Corrente's dog with his personal camera to document it. However, he never reported Corrente to anyone outside the chain of command, such as the prosecutor, internal affairs, or a newspaper, as it was "against policy" and "in the [Regulations]" that you could only report up the chain of command.

Plaintiff reported other incidents through the chain of command on other occasions as well. In February 2011, he reported an incident he saw on camera where a sergeant was assaulted by an inmate, as "all such major incidents have to be documented." In May 2011, an inmate told him he saw two officers

8

fighting, after which plaintiff "accessed video," because if there "is an issue, you go back to the video. . . . It's one of our tools. It's an extension to look into things we need to look into," and then reported the incident to Torkos as assaulting an officer was unlawful and would garner "mandatory jail time."

Corrente retired in December 2012, and Kowalski became undersheriff. Plaintiff was hoping to be promoted to lieutenant in January 2013, but was not, which he asserts was additional retaliation, although the record reflects he ranked tenth out of nine candidates and the positions were filled after the ninth candidate was promoted. Plaintiff then retired March 1, 2013; he asserts he was "progressively" set up for termination, and he felt he had to retire five months early or risk losing his pension. He was then denied a retirement breakfast, ostensibly due to budget issues, and he did not receive his retirement badge until much later.

On September 8, 2014, plaintiff filed a complaint against County of Morris, Morris County Sheriff's Department, Corrente, and Kowalski. The complaint alleged a single count of adverse employment actions and retaliation due to plaintiff's lawful exercise of his right to speak out and expose official misconduct and violations of law, which was in violation of plaintiff's right to freedom of speech as guaranteed by Article I, Paragraph 6 of the New Jersey

Constitution and the NJCRA, N.J.S.A. 10:6-1 to -2. In May 2018, all four defendants moved for summary judgment. After a September 14 hearing, the court granted defendants' motion in a September 19, 2018 written decision on the grounds that plaintiff spoke as a public employee, not as a citizen, which precluded his claims under the NJCRA. This appeal followed.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019) (citing Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).

Under Rule 4:46-2(c), a motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." A genuine issue of material fact exists where, when viewed in the light most favorable to the nonmoving party, a rational factfinder could find in favor of the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 540 (1995).

Plaintiff asserts he was subjected to retaliation for engaging in activity protected under Article I, Paragraph 6 of the New Jersey Constitution, which guarantees a citizen's right to freedom of speech, in that after reporting Corrente

was illegally using the jail's kennel to board his pet dog, defendants took adverse action against him.

The NJCRA, N.J.S.A. 10:6-1 to -2, permits an individual to bring a civil action when that individual's exercise of Constitutional rights has "been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law." N.J.S.A. 10:6-2(c). It was enacted as a state analog to 42 U.S.C. § 1983, Perez v. Zagami, 218 N.J. 202, 212 (2014), and as such, "the interpretation given to parallel provisions of [§] 1983 may provide guidance in construing our Civil Rights Act," Tumpson v. Farina, 218 N.J. 450, 474 (2014).

"It is well-established that a public employee does not relinquish his or her First Amendment right to comment on matters of public interest, otherwise available to citizens, simply as the result of the fact of public employment." In re Gonzalez, 405 N.J. Super. 336, 346 (App. Div. 2009). "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government," like writing a letter to a local newspaper, as in Pickering v. Board of Education, 391 U.S. 563, 566 (1968), or discussing politics with a co-worker, as in Rankin v.

McPherson, 483 U.S. 378, 384 (1987). Garcetti v. Ceballos, 547 U.S. 410, 417, 423-24 (2006).

A public employee's statement is protected under the First Amendment where "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result" of that statement. Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (emphasis added) (quoting Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006) (quoting Garcetti, 547 U.S. at 418)). The United States Supreme Court held that where "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id. at 421-22.

A-1038-18T1

Therefore, even where a communication may be of public importance, the claim will fail where the employee is not speaking as a citizen, but rather is speaking pursuant to his or her duties.  See Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 244-45 (3d Cir. 2016).  Accordingly, "before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking 'as a citizen' or, by contrast, pursuant to his duties as a public employee."  Foraker v. Chaffinch, 501 F.3d 231, 243 (3d Cir. 2007), abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379 (2011) (quoting Sigsworth v. City of Aurora, 487 F.3d 506, 509-10 (7th Cir. 2007)).

Whether speech was performed pursuant to an individual's job duties is a mixed question of fact—the scope and content of a plaintiff's job responsibilities—and law—the ultimate constitutional significance of those facts.  Flora v. Cty. of Luzerne, 776 F.3d 169, 175 (3d Cir. 2015) (citation omitted).  The inquiry as to the scope of an employee's duties "is a practical one."  Garcetti, 547 U.S. at 424.  The listing of a task in a written job description "is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes," as "job descriptions often bear little resemblance to the duties an

employee actually is expected to perform." Id. at 424-25. Generally, if the employee speech is part of what the employee is paid to do, it is largely unprotected. Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31, ___ U.S. ___, 138 S. Ct. 2448, 2471 (2018); see also Garcetti, 547 U.S. at 422. In Garcetti, the Court found an attorney was not speaking as a citizen in a disposition memorandum he wrote for his supervisor for a pending criminal case, as he was paid to do that task, and it was pursuant to his duties as a calendar deputy. 547 U.S. at 420-22.

Other federal cases can also provide guidance as to what constitutes speaking as a citizen versus speaking pursuant to one's duties. In Foraker, state police officers assigned as instructors to a firing range sent e-mails regarding safety issues and poor conditions up their chain of command, and argued that speech was protected because it was outside the scope of their duty, which they asserted was only to teach students how to fire weapons, not to speak out about health and safety problems. 501 F.3d at 233, 238. However, the court found the plaintiffs' claims were "foreclosed" because they were "expected, pursuant to their job duties, to report problems concerning the operations at the range up the chain of command," they spoke internally and "were required to speak up

14

the chain of command and were prevented from speaking to the press without prior approval." Id. at 241.

The Foraker court pointed out a distinction made by the Ninth Circuit in Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006), which found internal reports the public employee made documenting sexual harassment by prisoners and inaction on the part of her superiors were made pursuant to her official duties, whereas a letter she wrote to the Director of the California Department of Corrections and Rehabilitation explaining the hostile work environment she encountered was as a citizen. Foraker, 501 F.3d at 240.

"[A]n employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to his position as a government employee," such as where a public defender's speech to judges and other attorneys off the record and in the form of idle chatter was not speaking as a citizen, as he "had the opportunity to speak in court to attorneys and judges only as an ordinary corollary to his position" as a public defender. De Ritis v. McGarrigle, 861 F.3d 444, 450-51, 453-54 (3d Cir. 2017). The De Ritis court found that the plaintiff's ordinary job duties included in-court obligations to build rapport with judges and other attorneys, and all statements in court, even

if idle chatter and off the record, are official communications with official consequences.  Id. at 450-51, 453.

Similarly, where police officers filed a complaint against the city and the police department claiming an unlawful quota policy, which the court found to be a matter of public importance, their claims failed as they objected to the policy on police department counseling forms.  Fraternal Order of Police, Lodge 1, 842 F.3d at 236, 243.  The court found they were not speaking as citizens, as "[c]itizens do not complete internal police counseling forms.  Rather, completing counseling forms as part of the police disciplinary process falls under officers' official duties.  Therefore, the plaintiff-officers' speech here 'owe[d] its existence to [their] public employee[] professional responsibilities.'"  Id. at 244 (second, third, and fourth alterations in original) (quoting Gorum, 561 F.3d at 185).

By contrast, in Matthews, a police officer believed a quota system was damaging to his department's core mission, and reported it not up the chain of command, but directly to precinct commanders with whom he did not have regular interactions and who had an open door to citizens in the community for comments and complaints.  Matthews v. City of N.Y., 779 F.3d 167, 169, 175-76 (2d Cir. 2015).  While the police officer was required under the patrol guide

A-1038-18T1

to report criminal activity or other misconduct directly up the chain of command, the quota was not criminal nor expressly prohibited, and there was nothing in the scope of his duties or practical reality of his everyday work that indicated he was employed to speak out on policy matters. Id. at 174. The court held that "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." Ibid. (emphasis added).

Public employees were also found to be speaking as citizens in Lane v. Franks, 573 U.S. 228, 232-33, 238 (2014) (holding "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen," even where the testimony related to fraud the public employee uncovered during his employment); Flora, 776 F.3d at 180 (finding fact issues remained as to whether it was part of a public defender's "ordinary job duties" to publicly report lingering effects from government corruption or to file a class action lawsuit to compel adequate funding for his office after reporting up the chain of command failed to produce results; those actions merely "related to" his job duties, whereas the correct standard and "controlling factor" is whether

17

the statements were made "pursuant to" his duties); and in <u>Dougherty v. School District of Philadelphia</u>, 772 F.3d 979, 983-94, 988 (3d Cir. 2014) (finding a school employee's disclosure to a newspaper of alleged misconduct of a superintendent, while uncovered during the course of his duties, was as a citizen as "nothing about [the plaintiff]'s position compelled or called for him to provide or report this information," and the school district appeared to discourage such speech through its Code of Ethics' confidentiality provision).

Here, plaintiff's reports to his supervisors were pursuant to his ordinary job duties in that he was paid to monitor the facilities and report anything improper, unlawful, or against procedure. He discovered Corrente's dog was in the kennel using the video monitors, which he regularly used as one of his "tools" during the course of his daily activities to monitor activities in the jail. He was mandated to, and did, report unlawful acts and misconduct directly through the chain of command, not only as to Corrente but as to others, and the avenue of reporting was not one available to any citizen.

While plaintiff argues he was not responsible for the K-9 Unit or for supervising superior officers, and therefore his reports regarding Corrente's dog were not within the scope of his duties, that argument is not convincing. Plaintiff himself stated it was his obligation to report anything wrong, and

O'Brien, who also had nothing to do with the K-9 Unit, considered it his obligation to report Corrente's dog to his direct supervisor Pascale as well. Further, the Regulations specifically state members "knowing" of violations of laws or rules of "other members" are required to report them, without any mention of seniority or an assignment to monitor that person specifically. The Regulations further state that "administrative delegation of the enforcement of certain laws and ordinances to particular units of the [o]ffice does not relieve members of other units from the responsibility of taking prompt, effective police action within the scope of those laws and ordinances when the occasion so requires."

Because a review of the record in the light most favorable to plaintiff shows plaintiff's reports were in fact congruent with his duties as a corrections sergeant, in that they were within the scope of the regular duties he was paid to do, part of the practical realities of his every day work, and were made through channels not available to citizens generally, plaintiff's claims are precluded under the NJCRA, and summary judgment was appropriate.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1038-18T1