**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1433
_____

JOSEPH E. DE RITIS

v.

THOMAS J. MCGARRIGLE; MARIO J. CIVERA, JR.;
COLLEEN P. MORRONE; JOHN P. MCBLAIN;
DAVID J. WHITE, INDIVIDUALLY AND AS COUNTY
COUNCIL OF DELAWARE COUNTY;
CHAD F. KENNEY, INDIVIDUALLY AND AS
PRESIDENT OF THE BOARD OF JUDGES OF THE
COURT OF COMMON PLEAS OF DELAWARE
COUNTY; DOUGLAS C. ROGER, JR., INDIVIDUALLY
AND AS EXECUTIVE DIRECTOR OF THE OFFICE OF
THE PUBLIC DEFENDER OF DELAWARE COUNTY;
MICHAEL L. MADDREN, INDIVIDUALLY AND AS
SOLICITOR OF DELAWARE COUNTY;
DELAWARE COUNTY

Douglas C. Roger, Jr.,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. Civil Action No. 2:13-cv-06212)
Honorable Cynthia M. Rufe, U.S. District Judge

_____

Argued: January 17, 2017

Before: VANASKIE, KRAUSE, and NYGAARD, *Circuit Judges*

(Opinion Filed: June 29, 2017)

Joseph De Ritis, Esq. (Argued)
2029 Rose Lane
Broomall, PA 19008

*Plaintiff-Appellee Joseph De Ritis, pro se*

Mark A. Raith, Esq. (Argued)
Holsten & Associates
One Olive Street
Media, PA 19063

*Attorney for Defendant-Appellant Douglas C. Roger, Jr.*

_____

OPINION OF THE COURT
_____

2

KRAUSE, *Circuit Judge*.

To explain a perceived demotion to judges, other attorneys, and county officials, Appellee, an Assistant Public Defender, circulated a rumor he had heard and alleged he was being punished for taking too many cases to trial. After the Public Defender fired Appellee for those statements, Appellee filed suit, claiming a violation of his First Amendment rights, and the District Court denied the Public Defender's motion for summary judgment on the basis of qualified immunity. Because we conclude the First Amendment does not protect the speech at issue here—statements made while performing official job responsibilities, speculative comments about the reason for a perceived demotion, and recklessly false rumors circulated to government officials—we will reverse and remand.

## I.    Background

Appellee Joseph De Ritis became an Assistant Public Defender for Delaware County in December 2005. Consistent with the typical progression for attorneys in the Office of the Public Defender, De Ritis was first assigned to the Office's preliminary hearing unit, was elevated to the juvenile court unit in May 2007, and was ultimately assigned to a "trial team," or a group of three attorneys assigned to handle trials in a particular judge's courtroom, in November 2007.

But things changed in June 2012, when the Public Defender, Douglas C. Roger, Jr., informed De Ritis that staffing changes were necessary in the wake of another Assistant Public Defender's motorcycle accident and that De Ritis would be transferred back to the juvenile court unit.

3

Roger justified the transfer by noting that De Ritis was "an expert at juvenile law." App. 128A. Although De Ritis was not actually interested in juvenile law, he agreed to the transfer.

De Ritis suspected, however, that Roger had other reasons for transferring him, so he asked others whether they knew the true reasons for the transfer. He asserts his inquiries yielded fruit on two occasions. First, De Ritis contends that, one or two weeks after his transfer, First Assistant Public Defender Francis Zarilli told De Ritis that Roger had transferred him because De Ritis's clients were not pleading guilty fast enough, which was contrary to the wishes of Delaware County's President Judge, Chad Kenney. Second, De Ritis asserts that, later that month, Jake Dolan, a former Assistant Public Defender, gave him the same explanation, i.e., that Roger removed De Ritis from a trial team because he was not "moving [his] cases," App. 129A, 200A, though De Ritis concedes that his conversation with Dolan occurred during a "Taco Tuesday" session of after-work "gossip" and that Dolan professed his account was "fourth-person hearsay," App. 129A. De Ritis assumed Zarilli and Dolan's information was accurate, however, and he immediately began sharing it as the reason for his transfer—and continued to do so over the course of the next eleven months.

De Ritis's rumors proceeded in three phases. First, in the wake of his transfer to the preliminary hearing unit, he informed judges, private attorneys, and his colleagues at the Office of the Public Defender that he was "being punished" for "taking too many cases to trial." App. 134A, 174A. Although De Ritis did not speak "on the record" about why he was transferred, he acknowledges he shared the rumor while he was representing clients in court, "during the usual

4

idle chatter while waiting for court to begin or end." App. 175A. Despite circulating the alleged reason for his transfer widely, De Ritis did not discuss the issue with Roger.

Second, four months later, De Ritis's statements about his allegedly excessive trial practice intensified after Roger granted De Ritis's voluntary request to be transferred to the preliminary hearing unit. De Ritis continued sharing the rumor about being punished with attorneys and judges, even to the point of telling one judge, Judge Stephanie Klein, that he had been transferred because he "had refused . . . to obey a 'policy,' established by [Roger], that the Public Defenders' office should try to plead guilty as many criminal defendants as possible in order to more easily dispose of the cases assigned to us and pending before the court." App. 38A. De Ritis still did not discuss the issue with Roger himself.

Third, a few months later, De Ritis thought things would change when openings became available on the trial team for a newly elected judge. They did not. Although De Ritis asked Roger to assign De Ritis to the trial team, Roger declined. Unhappy with that result, De Ritis turned his efforts toward "seek[ing] an audience" with the County Council. App. 175A.

De Ritis initially pursued that goal by approaching the County Solicitor, Michael Maddren, and telling him the same rumor—namely, that Roger had transferred De Ritis off of a trial team because De Ritis was not "moving" cases and "wanted to take too many cases to trial," which was at odds with President Judge Kenney's preferences. App. 52A, 136A. De Ritis "suggested that this was violating the rights of his clients," particularly in view of "the constitutional implications of public defenders being demoted because they

5

advise defendants to seek trials." App. 52A, 176A. Although Maddren agreed to investigate, Maddren ultimately declined to pursue the matter further after contacting Roger and learning that De Ritis "was not performing well" as an Assistant Public Defender. App. 53A.

De Ritis then met with the chairman of the County Council, Thomas McGarrigle. De Ritis had "the same conversation" with McGarrigle that he had had with Maddren and stated that he would like to address the County Council about his situation. App. 137A, 176A. As Maddren had done, McGarrigle agreed to investigate, although it does not appear he contacted De Ritis again about the matter.

This rumormongering finally came to an end in May 2013, when Roger heard about De Ritis's allegations by means of Judge Klein's comments to another Assistant Public Defender. Astonished, Roger asked De Ritis whether the report from Judge Klein was true, and De Ritis admitted that, after appearing "in . . . court to handle a preliminary hearing," App. 38A, he had told Judge Klein that he was being punished for taking too many cases to trial. What's more, De Ritis also told Roger that he had made similar comments to other attorneys, to other judges, to Maddren, and to McGarrigle. Because of De Ritis's statements to all of these individuals, Roger fired De Ritis.

De Ritis brought suit against Roger soon after, seeking relief under 42 U.S.C. § 1983 and claiming that Roger's decision to fire De Ritis violated De Ritis's First Amendment rights.[1] After discovery, and in view of his status as a

_____

[1] In addition to Roger, De Ritis also named as defendants Judge Kenney; Maddren; the Delaware County Council and

6

government official, Roger moved for summary judgment on qualified immunity grounds, but the District Court denied the motion. *See De Ritis v. Roger*, 165 F. Supp. 3d 231, 239-46 (E.D. Pa. 2016). This appeal timely followed.

---

all of its members, including McGarrigle; and Delaware County itself as defendants. He brought the same First Amendment claim against those defendants and, in addition, brought claims against all defendants under the Fifth, Sixth, and Fourteenth Amendments of the Constitution and 42 U.S.C. § 1983; 42 U.S.C. §§ 1985, 1986, and 1988; the Pennsylvania common law of civil conspiracy, negligent infliction of emotional distress, and wrongful discharge; and the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. §§ 1423-1428. Except for De Ritis's First Amendment and Pennsylvania Whistleblower Law claims against Roger, the District Court dismissed or entered judgment in the defendants' favor on the other claims. *See De Ritis v. Roger*, 165 F. Supp. 3d 231, 246-50 (E.D. Pa. 2016); *De Ritis v. McGarrigle*, No. 13-6212, 2014 WL 2892419, at *2-9 (E.D. Pa. June 25, 2014). In this interlocutory qualified immunity appeal, Roger does not challenge the District Court's denial of summary judgment on the Pennsylvania Whistleblower Law claim, thus the First Amendment claim against Roger is the only claim before us.

7

## II. Jurisdiction[2] and Standard of Review

Where, as here, a district court has denied summary judgment and trial is still to come, we typically lack appellate jurisdiction under 28 U.S.C. § 1291, which allows us to review only "final" district court decisions. *See Johnson v. Jones*, 515 U.S. 304, 309 (1995). But "collateral orders," or orders that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred," equate to "final" decisions and qualify for immediate appeal. *Id.* at 310-11. Such is the order before us today.

"When the defense of qualified immunity is raised and denied, a defendant is generally entitled to an immediate appeal under the collateral order doctrine so long as the denial turns on an issue of law." *Oliver v. Roquet*, No. 14-4824, 2017 WL 2260961, at *3 (3d Cir. May 24, 2017). We thus have jurisdiction to review "whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right" and therefore to ground a denial of qualified immunity, *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014), and we decide this legal issue "with reference only to undisputed facts and in isolation from the remaining issues of the case," *Johnson*, 515 U.S. at 313. That is, we "take, as given, the facts that the district court assumed when it denied summary judgment," *Johnson*, 515 U.S. at 319, and we view them in

---

[2] The District Court had jurisdiction over De Ritis's First Amendment claim against Roger pursuant to 28 U.S.C. § 1331.

8

the light most favorable to De Ritis, the non-movant here, *Dougherty*, 772 F.3d at 986.

Within these parameters, our review is plenary, and we will overturn the District Court's denial of summary judgment "only when the record 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## III. Discussion

In reviewing a district court's denial of qualified immunity, we must reverse if the defending government official did not violate a statutory or constitutional right or, even if he did, if that right was not "clearly established" at the time of the challenged conduct. *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014). Here, addressing both prongs of qualified immunity, the District Court concluded that Roger had violated De Ritis's right to free speech and that the right, as defined by the District Court, was clearly established. *See De Ritis*, 165 F. Supp. 3d at 239-46. Although the District Court wrote a thoughtful and detailed opinion that wrestled with our case law and with the sensitive issues presented by this case, we ultimately disagree with its conclusion and hold that Roger did not violate De Ritis's First Amendment rights and that Roger therefore was entitled to qualified immunity.[3]

---

[3] While we have discretion to address the two prongs of qualified immunity in either order, we resolve this case at the first prong, both to "promote[] the development of constitutional precedent" and for efficiency's sake, as "a discussion of why the relevant facts do not violate clearly

9

The First Amendment of the Constitution broadly protects citizens' rights to "freedom of speech," U.S. Const. amend. I, and the law has long held that "citizens do not surrender their First Amendment rights by accepting public employment," *Lane*, 134 S. Ct. at 2374. However, unlike members of the general public who may be liable for defamation when they make statements with "actual malice," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), public employees' First Amendment rights are limited by the Government's countervailing interest in efficient provision of public services, *see Lane*, 134 S. Ct. at 2377, so in this context the First Amendment inquiry obliges us to apply a different test. Because De Ritis was a public employee, De Ritis's speech is protected by the First Amendment only (1) if he spoke "as a citizen (and not as an employee)," (2) if his speech involved "a matter of public concern," and (3) if his employer lacked an "adequate justification" for treating him differently from the general public, based on a balancing of his and his employer's interests under *Pickering v. Board of Education*, 391 U.S. 563 (1968). *See Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015).

After careful consideration, and in view of our plenary review of this question of law,[4] *Gorum v. Sessoms*, 561 F.3d

established law" would in this case "make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[4] Granted, whether speech is protected turns on a "mixed question of fact and law" when a dispute exists over "[w]hether a particular incident of speech is made within a particular plaintiff's job duties." *Flora v. Cty. of Luzerne*,

10

179, 184 (3d Cir. 2009); *see De Ritis*, 165 F. Supp. 3d at 244, we conclude that none of the statements for which De Ritis was fired qualifies as protected speech.[5] We divide those statements into three categories for purposes of analysis— (1) statements to judges and attorneys while in court, (2) statements to attorneys outside of the courthouse, and (3) statements to County Solicitor Maddren and County Council Chairman McGarrigle[6]—and consider the criteria for protected speech as applied to each category below.

---

776 F.3d 169, 175 (3d Cir. 2015). But the scope and content of De Ritis's job responsibilities is undisputed here, so whether De Ritis's statements qualify as protected speech is a purely legal question.

[5] Even if we held that De Ritis's speech was protected, De Ritis could ultimately prevail on his claim of First Amendment retaliation only if the District Court also held that his speech was "a substantial or motivating factor" in the decision to fire him and that, in the absence of that speech, Roger would not have fired him. *Munroe*, 805 F.3d at 466. Because the undisputed facts show De Ritis cannot establish protected speech, we need not reach these latter two elements of a First Amendment retaliation claim.

[6] We address De Ritis's statements to each of three categories of recipients because, even though the District Court's First Amendment analysis addressed only De Ritis's "statements to . . . Maddren and . . . McGarrigle," *De Ritis*, 165 F. Supp. 3d at 240, the District Court's order denied Roger qualified immunity with respect to all of De Ritis's statements, and an appeal is taken with respect to "the definitive order or judgment which follows the opinion," not

11

### 1. Citizen Speech

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). However, the line between citizen speech and employee speech varies with each case's circumstances, for we may not draw the line using such simple tests as whether the employee spoke "within the office," *id.* at 420-21, whether his statements were made pursuant to duties described in his "[f]ormal job description[]," *id.* at 424-25, or whether "speech concerns information related to or learned through public employment," *Lane*, 134 S. Ct. at 2377. We instead make a "practical" inquiry, *Garcetti*, 547 U.S. at 424, and assess "whether the speech at issue is itself ordinarily within the scope of an employee's duties," *Lane*, 134 S. Ct. at 2379. If so, then it is employee speech and receives no First Amendment protection.

Such is the case for De Ritis's in-court statements to attorneys and judges. It is undisputed that De Ritis's ordinary job duties included in-court obligations "to build rapport with the Court" and other attorneys. App. 46A. And for good reason, because attorneys, both private and public, are "officers of the Court," Model Rules of Prof'l Conduct r. 3.3 cmt. [2] (Am. Bar Ass'n 2015), and their statements in court, even if "idle chatter" and not "on the record," App. 175A, are then "[o]fficial communications" with "official

the opinion itself, *In re Chelsea Hotel Corp.*, 241 F.2d 846, 848 (3d Cir. 1957); *see* Fed. R. App. P. 4.

12

consequences" that create "a need for substantive consistency and clarity," *Garcetti*, 547 U.S. at 422. After all, even offhand in-court statements, particularly for government attorneys but also for private counsel, may affect the judicial process, *see* Model Rules of Prof'l Conduct r. 3.5; *cf. Cox v. Louisiana*, 379 U.S. 559, 565 (1965), and often the attorney's statements are a proxy for the positions of both his clients and his employer, *see* Model Rules of Prof'l Conduct rr. 1.2, 5.1, 5.2(b) & cmt. [2].[7] Accordingly, a supervising attorney like Roger "need[s] a significant degree of control" over his subordinate attorneys' in-court statements in order to prevent subordinates from "express[ing] views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti*, 547 U.S. at 418-19. Here, De Ritis's in-court statements to attorneys and judges were all made while waiting for a proceeding "on the record" to begin or end, App. 175A, and thus were part and parcel of his ordinary job duties—not citizen speech, *see Garcetti*, 547 U.S. at 422-24.

Our conclusion regarding De Ritis's in-court statements finds support in our case law on citizen speech. Our cases consistently hold that, though speech may be protected even if it "concerns information related to or learned through public employment," *Lane*, 134 S. Ct. at 2377; *see, e.g.*, *Flora v. Cty. of Luzerne*, 776 F.3d 169, 172-80 (3d Cir. 2015), an employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to his position as a government employee, *see Lane*,

---

[7] Indeed, the Pennsylvania Rules of Professional Conduct, which apply to De Ritis, say as much. *See* Pa. R. Prof'l Conduct rr. 1.2, 3.3 cmt. [2], 3.5, 5.1, 5.2(b) & cmt. [2].

13

134 S. Ct. at 2379; *Gorum*, 561 F.3d at 186. As we discussed in *Fraternal Order of Police, Lodge 1 v. City of Camden*, for example, police officers do not speak as citizens when they object to police department policies by means of "police department counseling forms," for "[c]itizens do not complete internal police counseling forms." 842 F.3d 231, 243-44 (3d Cir. 2016). Here, similarly, because De Ritis had the opportunity to speak in court to attorneys and judges only as an ordinary corollary to his position as an Assistant Public Defender, *see* App. 174A-75A, his speech in that role was not citizen speech.

To be sure, citizens may offer truthful in-court testimony as witnesses, *see Reilly v. City of Atl. City*, 532 F.3d 216, 231 (3d Cir. 2008), may bring class action lawsuits based on information learned through their jobs, *see Flora*, 776 F.3d at 176-80, and may even report alleged workplace misconduct to government officials, as De Ritis did in his meetings with Maddren and McGarrigle. Yet, just as citizens do not "complete internal police counseling forms," which are reserved for police officers, *Fraternal Order of Police*, 842 F.3d at 244, they also do not make "idle chatter [with attorneys and judges] while waiting for court to begin or end" as a public defender representing a client may do, App. 175A. Such chatter is not citizen speech and is not protected by the First Amendment.[8]

---

[8] Our discussion of citizen speech applies equally to De Ritis's communications with his clients as an Assistant Public Defender and to the application for a writ of habeas corpus that he filed on behalf of a client. Although De Ritis contends that these communications are protected by the First Amendment, they are clearly instances in which De Ritis

14

De Ritis did, of course, discuss the rumor about his transfers with attorneys while not in court and with Maddren and McGarrigle. And those statements *are* arguably citizen speech because they were not "part of the work [De Ritis] was paid to perform on an ordinary basis." *Flora*, 776 F.3d at 180. With those statements in mind, we turn to the second required attribute of protected speech: the requirement that the speech "involve a matter of public concern." *Munroe*, 805 F.3d at 466.

### 2.    Speech on a Matter of Public Concern

To involve a matter of public concern, speech must relate to "a subject of general interest and of value and concern to the public," whether it is a "matter of political, social or other concern to the community" or "a subject of legitimate news interest." *Lane*, 134 S. Ct. at 2380. By contrast, speech does not involve a matter of public concern when it relates solely to "mundane employment grievances." *Munroe*, 805 F.3d at 467.

We determine the public or nonpublic nature of an employee's speech by reference to the speech's "content, form, and context," *Lane*, 134 S. Ct. at 2380, which encompasses "the employee's motivation as well as whether

---

spoke in his capacity as an Assistant Public Defender and not in his capacity as a citizen, as it is undisputed that "talk[ing] to the client to . . . get . . . [his or her] input into working out the case" and "get[ting] done what was needed to favorably resolve the client's case[]," App. 45A, were activities "ordinarily within the scope of [De Ritis's] duties," *Lane*, 134 S. Ct. at 2379.

15

it is important to our system of self-government that the expression take place," *Munroe*, 805 F.3d at 467. But we do not consider whether a statement is "inappropriate" or "controversial," because "humor, satire, and even 'personal invective'" can make a point about a matter of public concern. *Id.* at 470. The "tone of the communications" is irrelevant. *Johnson v. Lincoln Univ. of Commonwealth Sys. of Higher Educ.*, 776 F.2d 443, 451-52 (3d Cir. 1985).

Because we are not to "make a superficial characterization of the speech or activity taken as a whole," we conduct "a particularized examination of each activity for which the protection of the First Amendment is claimed" to determine whether it involves a matter of public concern, *id.* at 451; *see, e.g.*, *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Munroe*, 805 F.3d at 469-70; *Johnson*, 776 F.2d at 450-54, while taking care not to "'cherry pick' something that may impact the public while ignoring [its] manner and context," *Munroe*, 805 F.3d at 467. That is to say, we will hold that a discrete unit of speech addresses a matter of public concern if it discusses "fundamental problems" reaching beyond the employee's "day-to-day minutiae," *Watters v. City of Phila.*, 55 F.3d 886, 894 (3d Cir. 1995), such as a concern that all assistant district attorneys in an office are required to work on political campaigns, *see Connick*, 461 U.S. at 148-49, a concern about academic integrity in today's youth generally, *see Munroe*, 805 F.3d at 469-70, or a concern about academic standards applicable to a university as a whole, *see Johnson*, 776 F.2d at 451-54. But if a discrete unit of speech addresses only the employee's own problems, and even if those problems "brush . . . against a matter of public concern" by virtue of that employee's public employment, then that

16

speech is merely a "personal grievance." *Miller v. Clinton Cty.*, 544 F.3d 542, 551 (3d Cir. 2008).[9]

Applying these principles here, we hold that De Ritis's out-of-court statements to other attorneys did not involve a matter of public concern, while his statements to Maddren and McGarrigle did. The undisputed evidence in the record establishes that De Ritis's out-of-court statements to other attorneys addressed only De Ritis's own employment situation: "*I'm* being punished." "Apparently, *I'm* taking too many cases to trial." "Judge Kenney thinks *I'm* telling too many defendants they can have trials." App. 134A, 174A-175A (emphases added). In these statements, De Ritis never discussed any "fundamental problems" reaching beyond his own "day-to-day minutiae," *Watters*, 55 F.3d at 894, such as, for example, his later contention that his clients' rights were being violated. De Ritis's out-of-court statements to attorneys, thus, at most "brush[ed] . . . against" matters of public concern, *Miller*, 544 F.3d at 551, and they do not merit First Amendment protection.

De Ritis's conversations with Maddren and with McGarrigle are a different matter. In both of those discussions, De Ritis went further and expressed concern for

---

[9] De Ritis asks us to overrule *Miller* on the ground that it is at odds with *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). We decline to do so, as *New York Times* did not arise in the public employment context, where "the First Amendment allows a public employer to regulate its employees' speech in ways it could never regulate the general public's." *Swineford v. Snyder Cty.*, 15 F.3d 1258, 1270 (3d Cir. 1994).

17

individuals other than himself: he suggested that the reason he believed he was transferred, i.e., his penchant for taking too many cases to trial, violated "the rights of his clients" to the point of having "constitutional implications." App. 52A, 176A. That is, he did not confine his complaints to his own employment situation, *cf. Miller*, 544 F.3d at 550-51, but instead spoke about a "matter of political, social or other concern to the community" in discussing the rights of criminal defendants generally, *Lane*, 134 S. Ct. at 2380, and in seeking a "public mien" for his complaints, *Swineford v. Snyder Cty.*, 15 F.3d 1258, 1272 (3d Cir. 1994).

At the same time, we recognize that, because "six months or eight months" elapsed before De Ritis attempted to investigate the truth of the rumor he was spreading, App. 131A, and because no evidence in the record other than De Ritis's own testimony supports the rumor's truth, De Ritis's statements to Maddren and to McGarrigle were "recklessly . . . false," *Swineford*, 15 F.3d at 1272.[10] But that fact means merely that his interest, "as a citizen, in commenting upon matters of public concern" receives less weight when balanced against the employer's interest "in promoting the efficiency of the public services it performs

---

[10] We disagree with the District Court's statement that "there is no evidence that [De Ritis's] speech was knowingly or recklessly false," *De Ritis*, 165 F. Supp. 3d at 242, a legal conclusion over which our review remains plenary, *see Dougherty*, 772 F.3d at 986. We hold, as a matter of law, that a person's speech is recklessly false when he disseminates "gossip" in the form of "fourth-person hearsay" and chooses to do so for "six months or eight months" without investigating its truth. App. 129A, 131A.

through its employees" at the third step of the protected speech analysis, *Munroe*, 805 F.3d at 466; *see, e.g.*, *Swineford*, 15 F.3d at 1274; it does not mean that his statements to Maddren and to McGarrigle are *per se* unprotected, for matters of public concern may "overlap" with matters that do not receive First Amendment protection, such as "personal grievances," *see Fraternal Order of Police*, 842 F.3d at 243. We thus go on to consider whether De Ritis's statements to Maddren and to McGarrigle nonetheless lack protection because they gave Roger adequate justification to treat De Ritis differently from a member of the general public.

### 3. Justification for Treating De Ritis Differently from the Public

At the third step of the protected speech analysis, we inquire into whether Roger had "adequate justification" for treating De Ritis "differently than the general public based on [his] needs as an employer under the *Pickering* balancing test." *Munroe*, 805 F.3d at 466. Specifically, we balance De Ritis's interests, "as a citizen, in commenting upon matters of public concern" with "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (citing *Pickering*, 391 U.S. at 568). If the Government's interest is "significantly greater" than De Ritis's interest in contributing to public debate, then De Ritis's speech is not protected. *Pickering*, 391 U.S. at 573.

First, we consider De Ritis's "interest in engaging in [his] speech," *Miller*, 544 F.3d at 548, and "the interest[] of . . . the public in the speech at issue," *Dougherty*, 772 F.3d at 991. Because "a stronger showing of government interests may be

necessary if the employee's speech more substantially involves matters of public concern," *Lane*, 134 S. Ct. at 2381 (brackets omitted), the magnitude of this interest rests on the extent to which De Ritis's speech addressed an issue of public concern, *see Miller*, 544 F.3d at 549-50. Although "the public has a significant interest in encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of public officials," *Dougherty*, 772 F.3d at 991 (brackets and ellipsis omitted), it has little interest in speech that "brush[es] ever so gently against a matter of public concern" but nonetheless remains "focused upon [the employee's] private grievances as an employee," *Miller*, 544 F.3d at 550-51.

De Ritis's speech here is more a private grievance than an instance of legitimate whistleblowing, and thus we accord De Ritis's side of the scale lesser weight. Even as De Ritis urged Maddren and McGarrigle to investigate alleged misconduct he viewed to "violat[e] the rights of his clients," De Ritis remained focused on how his perceived demotion "was hurting his career" and how he wanted Maddren and McGarrigle "to intervene in the administration of the Public Defender's Office on his behalf." App. 52A-53A. Notably, De Ritis did not seek intervention to protect the rights of the Public Defender Office's clients generally; he sought intervention only with respect to his own employment situation.

More importantly, De Ritis's "continued failure to verify and substantiate" his allegations points up his "self-interest." *Swineford*, 15 F.3d at 1274. Although De Ritis was not necessarily required to discuss his complaints with his supervisor, Roger, *see Czurlanis v. Albanese*, 721 F.2d 98, 105 (1983), he waited "six months or eight months" before

20

approaching Maddren and McGarrigle about his concerns, App. 131A, and he could have taken that step much sooner. By his own admission, he did not do so because he "thought it was going to work itself out"—in other words, because he thought that, if his "punishment" ended and he was returned to a trial team, there would be no need to broach the topic with Maddren or with McGarrigle. App. 131A, 133A. De Ritis's "prolonged failure to authenticate [his] allegations . . . approaches reckless indifference to their veracity," *Swineford*, 15 F.3d at 1274, which we would hold against De Ritis even if his allegations were true, for "[t]he issue is not falsity *vel non* but whether [the] statements . . . were knowingly and recklessly made," *Springer v. Henry*, 435 F.3d 268, 278 (3d Cir. 2006). In sum, De Ritis's statements to Maddren and to McGarrigle showed "self-interest, not public spirit." *Swineford*, 15 F.3d at 1274.

Second, on the other side of the scale, we consider Roger's "countervailing interests, including [his] prerogative of removing employees whose conduct impairs performance," as well as "concerns for the morale of the workplace, harmonious relationships among co-workers, and the regular operation of the enterprise." *Miller*, 544 F.3d at 548. Those countervailing interests are substantial here. De Ritis's statements, which accused Roger of managing the Office in a way that would appease a judge at the expense of clients' rights, "impugned the integrity of his superiors" and colleagues in a weighty manner. *Watters v. City of Phila.*, 55 F.3d 886, 898 (3d Cir. 1995) (brackets and internal quotation marks omitted). As Roger aptly put it, De Ritis "cut[] to the core of [their] integrity as public defenders and fundamentally threaten[ed] the idea that [they] are committed to zealously defending the people [they] represent." App. 39A.

What's more, in a small office of twenty-seven public defenders, such statements "would seriously undermine the effectiveness of the working relationship" between De Ritis and Roger, *Watters*, 55 F.3d at 897 (quoting *Pickering*, 391 U.S. at 570 n.3), the Public Defender whose positions he represents before the courts and the public, *see* 16 Pa. Cons. Stat. § 9960.5(a) (stating that "assistant public defenders" enable the public defender "to carry out the duties of his office"). Although not an "alter ego" of the public defender, *Sprague v. Fitzpatrick*, 546 F.2d 560, 565 (3d Cir. 1976), an assistant public defender is appointed or hired as a representative of the public defender, *see, e.g.*, 18 U.S.C. § 3006A(g)(2)(A); 16 Pa. Cons. Stat. § 9960.5(a), just as an assistant United States attorney represents the United States Attorney under whom she serves. These "close working relationships for which personal loyalty and confidence are necessary," *Dougherty*, 772 F.3d at 991, are distinct from those inherent in, for example, administrative roles or even a position as an associate at a law firm, where job descriptions and titles do not rest on the idea that the employee necessarily represents the positions of his supervisor, *cf. id.* at 982-84, 992. Here, therefore, "the potential disruptiveness" of De Ritis's speech was considerable. *Watters*, 55 F.3d at 896.[11]

---

[11] Although De Ritis asserts that Roger provided no evidence of disruption, Roger had no need to do so, for it is clear here "that disruption [was] likely to occur because of [De Ritis's] speech," *Munroe*, 805 F.3d at 472, and the *Pickering* balancing test asks us to focus our disruptiveness analysis on whether the government employee's speech was

Under the *Pickering* balancing test, De Ritis's interest in disseminating "fourth-person hearsay," gleaned from after-work "gossip," App. 129A, pales in comparison to the "potential disrupt[ion]" it could have caused to the Public Defender's Office, *Watters*, 55 F.3d at 896. Whatever First Amendment value De Ritis's statements had, those statements gave Roger adequate justification to treat him differently from a member of the public. For that reason, we conclude at this third stage of the analysis that De Ritis's speech was not protected, putting a hard stop to his First Amendment claim against Roger and entitling Roger to qualified immunity for his decision to fire De Ritis.[12] On remand, therefore,

---

"*likely* to be disruptive," *Watters*, 55 F.3d at 896 (emphasis added).

[12] As we conclude that there was no constitutional right violated by Roger under then-existing case law, *a fortiori*, such right was not "'clearly established' at the time of the challenged conduct," *Lane*, 134 S. Ct. at 2381, and thus Roger was entitled to qualified immunity on that independent ground. The District Judge here diligently identified the relevant case law and properly recognized as a general matter that a public employee has a clearly established right to "alleg[e] misconduct or wrongdoing by public officials." *De Ritis*, 165 F. Supp. 3d at 245; *see, e.g.*, *Dougherty*, 772 F.3d at 982-84, 987-94; *Czurlanis*, 721 F.2d at 100-07. That description of the right, however, is so general as to encompass not only cases where speech alleging misconduct or wrongdoing is protected, *see, e.g.*, *Dougherty*, 772 F.3d at 982-84, 987-94, but also those where it is not, *see, e.g.*, *Swineford*, 15 F.3d at 1262-64, 1269-74. Under our case law, the "clearly established" inquiry requires reference not to

23

judgment should be entered in Roger's favor on this claim. *See Lane*, 134 S. Ct. at 2381.

## IV. Conclusion

For the foregoing reasons, we will reverse the District Court's denial of qualified immunity and remand for proceedings consistent with this opinion.[13]

---

such "broad general proposition[s]," but to precedent that is "factually similar to the plaintiff's allegations," based on "the specific context of the case." *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d. Cir. 2016).

[13] Our disposition reaches only the First Amendment claim against Roger, as the pending Pennsylvania Whistleblower Act claim is not before us on appeal. *See supra* note 1. On remand, the District Court should "consider . . . the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . [that] pendent state-law claim[]" or to dismiss that claim without prejudice. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n.7 (1988); *see* 28 U.S.C. § 1367(c)(3); *see, e.g.*, *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009); *Growth Horizons, Inc. v. Del. Cty., Pa.*, 983 F.2d 1277, 1284-85 (3d Cir. 1993).