**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1588
_____

COLLEEN M. BRADLEY,
                                        Appellant

v.

WEST CHESTER UNIVERSITY OF THE
PENNSYLVANIA STATE SYSTEM OF HIGHER
EDUCATION; MARK MIXNER; LAWRENCE A.
DOWDY; DR. GREGORY R. WEISENSTEIN; DR. MARK
G. PAVLOVICH; PENNSYLVANIA STATE SYSTEM OF
HIGHER EDUCATION; LOIS M. JOHNSON

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-15-cv-02681)

District Judge: Honorable Michael M. Baylson

Argued November 8, 2017

Before: SMITH, *Chief Judge*, HARDIMAN,

*Circuit Judge*, and BRANN, *District Judge*[*]

(Filed: January 26, 2018)

Daniel J. Kearney                    **[ARGUED]**
Adams Kearney
6 East Hinckley Avenue
Ridley Park, PA 19078

Edward S. Mazurek
Suite 516
717 South Columbus Boulevard
Philadelphia, PA 19147
        *Counsel for Appellant*

Josh Shapiro
*Attorney General*
John G. Knorr, III                   **[ARGUED]**
*Chief Deputy Attorney General*
*Chief, Appellate Litigation Section*
Stephen R. Kovatis
*Deputy Attorney General*
Office of Attorney General of Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120
        *Counsel for Appellees*

---

[*]   The Honorable Matthew W. Brann, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

2

_____

OPINION

_____

BRANN, *District Judge.*

While employed in an administrative position at West Chester University of Pennsylvania, Colleen Bradley shared her concerns about one of the school's budget documents with her colleagues. Subsequently, she was informed by her supervisor that her employment contract would not be renewed. Arguing that her speech was protected by the First Amendment to the United States Constitution and that her termination was in retaliation for that speech, she sued the school, the Pennsylvania State System of Higher Education, her supervisor, and several other administrators.

The United States District Court for the Eastern District of Pennsylvania dismissed Ms. Bradley's claim against West Chester and the State System, holding that those institutions were entitled to immunity under the Eleventh Amendment to the United States Constitution. After discovery, the District Court granted summary judgment in favor of Ms. Bradley's supervisor, Mark Mixner, holding that, although Ms. Bradley's speech was constitutionally protected, Mr. Mixner was entitled to qualified immunity.

We will affirm both of these rulings of the District Court. We agree with the District Court's holding on Eleventh

3

Amendment immunity, and therefore uphold its dismissal of the claims against West Chester and the State System. We disagree with the District Court's holding on the protected status of Ms. Bradley's speech, but because we hold that the speech was *not* constitutionally protected, we uphold its grant of summary judgment in favor of Mr. Mixner.

I.

A.[1]

Colleen Bradley was hired as Director of Budget and Financial Planning at the West Chester University of Pennsylvania ("WCU") in November 2011. In that position, Ms. Bradley was responsible for, *inter alia*, reviewing the university's budget creation process and recommending improvements to it, as well as attending and participating in various administrative meetings. Ms. Bradley's immediate supervisor at WCU was Mark Mixner, the university's Vice President of Finance and Administration.

One of Ms. Bradley's regular assignments was to assist in the preparation of what was known as a "BUD Report."[2] As a member institution of the Pennsylvania State System of

---

[1] Because we are reviewing the District Court's grant of summary judgment in favor of Mr. Mixner, the following facts are either undisputed or viewed in the light most favorable to Ms. Bradley, and we have drawn all reasonable inferences from those facts in her favor. *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014).

[2] App. 469.

Higher Education ("PASSHE"),[3] WCU regularly submitted a budget—or BUD Report—to PASSHE. PASSHE, in turn, would compile its member universities' BUD Reports and submit them to the Commonwealth for appropriation purposes.

While creating one of WCU's annual BUD Reports, Ms. Bradley was instructed by PASSHE administrators to increase the "Transfer to Plant" line item in the report by several million dollars, which would "swing" the report's showing of a multi-million dollar surplus to a showing of a multi-million dollar deficit.[4] The "swing," in her view, was purposely designed; when she questioned a PASSHE administrator about the practice, she was told that the BUD Report "was a political document[,] and if you don't present this deficit, your appropriation money is at risk."[5] Ms. Bradley also spoke to Mr. Mixner, who agreed with the characterization of the BUD Report as a "political document" and urged Ms. Bradley to cooperate with the PASSHE administrators' request.[6]

Ms. Bradley regularly attended the weekly meetings of WCU's Administrative Budget Committee ("ABC"). On September 20, 2012, at one of these meetings, Ms. Bradley

---

[3] PASSHE comprises fourteen universities: Bloomsburg, California, Cheyney, Clarion, East Stroudsburg, Edinboro, Indiana, Kutztown, Lock Haven, Mansfield, Millersville, Shippensburg, Slippery Rock, and West Chester. 24 P.S. § 20-2002-A(a).

[4] App. 73, 469-70.

[5] App. 468.

[6] App. 469.

discussed the BUD Report, expressing her belief that the PASSHE-requested alterations were "unethical and quite frankly, [possibly] illegal."[7] She also told the ABC that "I'm bringing it to this committee because I feel as though it is my responsibility because you are the budget committee, and I just need to explain the predicament we're all in."[8] A few days later, Mr. Mixner expressed his displeasure at Ms. Bradley's comments to the ABC, noting that he "could not believe that [she] would present such a packet to the budget committee," and that her "credibility as well as [her] future was at risk."[9]

At the next ABC meeting, on September 27, 2012, Ms. Bradley circulated a memorandum documenting her concerns. It noted that she "object[ed] to [the] submission" of the BUD Report showing a deficit, and "to the entire reporting process."[10] It also stated that:

> I am an employee of the State and the University and it is my responsibility to report data that I can support and explain. Currently, I cannot explain or justify this budgeting technique and the implications make me very uncomfortable. I have openly and cooperatively been seeking answers to authenticate the data, but have not received any response. In the meantime, it has been explained to me that my actions last week have endangered my credibility and I find this hugely disappointing due to [sic] I am seeking

---

[7] *Id.*

[8] App. 470.

[9] App. 469.

[10] App. 169.

> truth and trying to perform my job with integrity and honesty.[11]

Presumably, however, Ms. Bradley's actions did not persuade anyone at PASSHE or WCU to change the BUD Report practice at that time.

More than two years after the September 2012 ABC meetings, Mr. Mixner asked Ms. Bradley to assist in preparations for an October 29, 2014 meeting of WCU's Enrollment Management Committee ("EMC"), which was being held to prepare for a presentation to a group of WCU's "opinion leaders" the following day.[12] Leading up to the meeting, Mr. Mixner and Ms. Bradley considered several possible budgets for presentation to the EMC. The night before the meeting, however, Mr. Mixner indicated his desire to use a version of the budget with "non-discounted scenarios"—*i.e.*, in Ms. Bradley's opinion, a version of the budget that "inflated the expenses."[13]

At the EMC meeting, Ms. Bradley presented Mr. Mixner's preferred budget, which showed a $15 million deficit. An EMC member, who had apparently believed that WCU had an $11 million surplus, queried how such a deficit was possible, especially in light of increased enrollment at WCU. Ms. Bradley expressed amusement at this question ("Well, it's funny that you say that . . . ."), indicated that Mr.

---

[11] *Id.*

[12] App. 475.

[13] App. 476, 755. In Ms. Bradley's opinion, her preferred budget reflected "reality," while Mr. Mixner's "showed the sky is falling." App. 475.

7

Mixner had chosen that specific budget, and proceeded to present an alternate budget, which, she believed, "presents reality."[14]

Mr. Mixner was angered by Ms. Bradley's decision to present her budget at the EMC meeting. Although she was expected to speak at the "opinion leaders" presentation the next day, Ms. Bradley refused to do so unless she could present her version of the budget. Mr. Mixner refused that request and presented his budget instead. Ms. Bradley did not speak at that presentation and "was embarrassed to be there."[15]

A few weeks later, at an in-person meeting, Mr. Mixner told Ms. Bradley that she was "not the cultural fit for the university" and that her contract would not be renewed.[16] Mr. Mixner formalized this decision in a November 18, 2014 letter, which stated that he "no longer ha[d] confidence that [she] can provide the leadership that the University needs."[17] Ms. Bradley's contract expired on June 30, 2015.

B.

On May 14, 2015, Ms. Bradley initiated the instant action by filing a four-count complaint in the Eastern District of Pennsylvania against Mr. Mixner, WCU, PASSHE, and a number of other WCU and PASSHE administrators. In Count I, brought under 42 U.S.C. § 1983, she alleged that her termination was unconstitutional retaliation for speech protected by the First Amendment. In Count II, brought under

---

[14]  App. 476.
[15]  App. 477.
[16]  App. 478.
[17]  App. 384.

8

the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421-28, she likewise alleged that her termination was unlawful retaliation. In Counts III and IV, Ms. Bradley alleged that defendants' actions constituted, respectively, intentional and negligent infliction of emotional distress.

The District Court dismissed Count I of this complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) on December 9, 2015, holding that WCU and PASSHE, as well as the administrators in their official capacities, were entitled to Eleventh Amendment immunity under this Court's decision in *Skehan v. State System of Higher Education*,[18] and that, therefore, the court lacked jurisdiction to hear claims against those parties. It granted Ms. Bradley leave to amend her complaint, however, to name the administrators in their individual capacities. Ms. Bradley did so in an amended complaint filed January 15, 2016.

On April 19, 2016, the District Court dismissed Counts I, III, and IV of Ms. Bradley's Amended Complaint as to all defendants except Mr. Mixner in his individual capacity. It dismissed Count II without prejudice, in order to allow Ms. Bradley to refile that claim in state court.

On March 3, 2017, the District Court granted summary judgment in favor of Mr. Mixner on Count I.[19] Although it held that, under this Court's precedent, Ms. Bradley's speech was protected by the First Amendment, it also held that Mr. Mixner was entitled to qualified immunity for terminating Ms. Bradley because his conduct did not violate a clearly

---

[18] 815 F.2d 244 (3d Cir. 1987).

[19] Ms. Bradley withdrew the claims in Counts III and IV on November 21, 2016.

established federal right.

Ms. Bradley filed a notice of appeal on March 16, 2017. In this Court, she challenges the District Court's December 9, 2015 order dismissing WCU and PASSHE on the grounds of Eleventh Amendment immunity, and the District Court's March 3, 2017 order granting summary judgment in favor of Mr. Mixner.

## II.

### A.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction under 28 U.S.C. § 1291.

### B.

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[20] A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[21] To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[22]

---

[20] Federal Rule of Civil Procedure 56(a).

[21] *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986)).

[22] Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[23]

We review a District Court's grant of summary judgment *de novo*.[24] We likewise review the District Court's holding on Eleventh Amendment sovereign immunity *de novo*.[25]

## C.

We first consider whether the District Court properly granted summary judgment in favor of Mr. Mixner on Ms. Bradley's First Amendment retaliation claim.

Although "public employees do not surrender all their First Amendment rights by reason of their employment,"[26] the United States Supreme Court has noted the need to strike a "careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern[,] and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its

---

[23] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[24] *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009).

[25] *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 82 (3d Cir. 2016).

[26] *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see also Rankin v. McPherson*, 483 U.S. 378, 383 (1987) ("[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.").

11

employees.'"[27]  Thus, when considering a First Amendment retaliation claim, we first inquire whether the speech at issue is, in fact, constitutionally protected, and then consider whether the government had an "'adequate justification' for treating the employee differently than the general public based on its needs as an employer."[28]  The District Court held that Ms. Bradley's speech was constitutionally protected, but nevertheless granted summary judgment in favor of Mr. Mixner on qualified immunity grounds.  We disagree with the District Court's conclusion as to the protected status of Ms. Bradley's speech, but—because we may affirm on any ground supported by the record[29]—uphold its judgment in favor of Mr. Mixner.

1.

Speech by government employees is constitutionally protected when the employee is speaking "as a citizen, not as an employee," and when the speech "involve[s] a matter of public concern."[30]  If these two prerequisites are not met, a public employee "has no First Amendment cause of action based on his or her employer's reaction to the speech."[31]

---

[27] *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014) (first alteration in original) (quoting *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)).

[28] *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 987 (3d Cir. 2014) (quoting *Gorum*, 561 F.3d at 185).

[29] *Gorum*, 561 F.3d at 184.

[30] *Dougherty*, 772 F.3d at 987.  Here, the parties do not dispute that Ms. Bradley's speech involved a matter of public concern.

[31] *Garcetti*, 547 U.S. at 418.

In *Garcetti v. Ceballos*, the United States Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes," and that, therefore, "the Constitution does not insulate their communications from employer discipline."[32] In that case, a deputy district attorney alleged that he was unconstitutionally retaliated against after composing an internal memorandum that discussed perceived "serious misrepresentations" in a search warrant affidavit.[33] The Supreme Court noted that the attorney "expressed his views inside his office, rather than publicly," and that the "memo concerned the subject matter of [his] employment," but noted that these factors were not dispositive.[34] The "controlling factor," instead, was that the memo was written "pursuant to [the attorney's] duties as a calendar deputy"—*i.e.*, he wrote it "because that is part of what he, as a calendar deputy, was employed to do."[35]

---

[32] *Id.* at 421; *see also id.* at 421-22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.").

[33] *Id.* at 413-15.

[34] *Id.* at 420-21.

[35] *Id.* at 421; *see also Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014) (characterizing the memorandum at issue in *Garcetti* as "prepared . . . in the course of [the plaintiff's] ordinary job responsibilities").

Because the parties in *Garcetti* did not dispute that the attorney's memo was written pursuant to his official duties, the Supreme Court admitted that it "ha[d] no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate," and noted that "[t]he proper inquiry is a practical one."[36] This Court has fleshed out that framework in a series of decisions. In *Foraker v. Chaffinch*, for example, we held that state troopers were speaking pursuant to their official duties when they expressed concerns about deficiencies at a firing range up their chain of command and with the State Auditor, since monitoring the range was "among the tasks [they] were paid to perform."[37] In *Gorum v. Sessoms*, we held that a tenured university professor was speaking pursuant to his official duties when he served as a student's advisor at a disciplinary hearing and when he withdrew the university president's invitation to speak at a fraternity prayer breakfast, since "[i]t was through his position as a professor and department chair" that he was able to counsel the student, and since the professor chaired the fraternity's speakers committee.[38] And in *De Ritis v. McGarrigle*, we held that a public defender was speaking pursuant to his official duties when he made in-court comments to the effect that his transfer to a different office unit was "punish[ment] for taking too many cases to trial," since he had "in-court obligations to build rapport with the Court," which could be accomplished through such off-the record "idle chatter," and since "the mode and

---

[36] *Garcetti*, 547 U.S. at 424.

[37] *Foraker v. Chaffinch*, 501 F.3d 231, 233-34, 241-43 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).

[38] *Gorum v. Sessoms*, 561 F.3d 179, 186 (3d Cir. 2009).

manner of his speech were possible only as an ordinary corollary to his position as a government employee."[39]

On the other hand, in *Dougherty v. School District of Philadelphia*, we held that a school district employee was *not* speaking pursuant to his official duties—and was instead speaking as a citizen—when he disclosed alleged misconduct by the school superintendent to a local newspaper.[40]  And in *Flora v. County of Luzerne*, we held that a public defender sufficiently alleged that he was speaking as a citizen when he initiated a class action lawsuit on behalf of indigent criminal defendants and reported his county's noncompliance with a Pennsylvania Supreme Court order to the Special Master whose report had given rise to that order.[41]

2.

Here, Ms. Bradley claims that she was speaking as a citizen when she raised her budget concerns at the EMC meeting on October 29, 2014.[42]  Unfortunately for her cause,

---

[39] *De Ritis v. McGarrigle*, 861 F.3d 444, 449, 453-54 (3d Cir. 2017) (quoting affidavit and complaint).

[40] *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 983, 988 (3d Cir. 2014).

[41] *Flora v. Cty. of Luzerne*, 776 F.3d 169, 173, 179-80 (3d Cir. 2015).

[42] In the District Court, Ms. Bradley also argued that she was speaking as a citizen during the ABC meetings of September 20 and 27, 2012.  At oral argument before this Court, however, Ms. Bradley's counsel abandoned that argument.  Oral Argument at 1:56-2:40, *Bradley v. W. Chester Univ.*, No. 17-1588 (3d Cir. Nov. 8, 2017),

15

this case falls squarely within the framework of *Garcetti*, *Foraker*, *Gorum*, and *De Ritis*—*i.e.*, her speech at that meeting was made pursuant to her official duties, and was therefore not protected by the First Amendment. Ms. Bradley's job description indicated that she was expected to "[r]eview and recommend, as requested, changes to the University[']s budget allocation processes,"[43] and she agreed that her position, in practice, included those responsibilities.[44] She attended the EMC meeting at the behest of Mr. Mixner, her direct supervisor, and the record contains no indication that the meeting was open to the public. She recommended her alternate budget—the one she felt "presents reality"—directly in response to a question from one of the EMC's members. In other words, she spoke "because that is part of what [s]he . . . was employed to do,"[45] in a "mode and manner [that] were possible only as an ordinary corollary to h[er] position."[46]

---

http://www2.ca3.uscourts.gov/oralargument/audio/17-1588Bradleyv.WestChesterUniv.mp3.

[43] App. 78.

[44] Formal job descriptions may factor into the analysis of a plaintiff's official duties, but because they "often bear little resemblance to the duties an employee actually is expected to perform . . . the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006).

[45] *Id.* at 421.

[46] *De Ritis*, 861 F.3d at 454.

To support her argument that she was speaking as a citizen, Ms. Bradley points to the fact that Mr. Mixner, in his deposition, indicated that it was not part of Ms. Bradley's "ordinary duties" to either "investigate misrepresentations of financial information" or to "report willful misrepresentations of financial information."[47] The District Court may have had this testimony in mind when it noted that "[t]here is a difference between recommending changes to improve or streamline an existing policy and upending the policy with accusations that it is in itself fraudulent."[48] The undisputed facts, however, show that Ms. Bradley was paid to critically evaluate WCU's budgeting process—*i.e.*, scrutinizing and analyzing the numbers appearing in the budget was part of her job. That is what she was doing at the EMC meeting on October 29, 2014, and that is why we hold that she was speaking pursuant to her official duties as a public employee at that meeting, and not as a citizen.

Ms. Bradley also points to portions of Mr. Mixner's deposition testimony where he indicated that it was not part of Ms. Bradley's "ordinary duties" to "report to senior leaders of [WCU] outside her chain of command."[49] Some courts have predicted that bypassing a government bureaucracy's normal pecking order would be outside a public employee's ordinary

---

[47] App. 519.
[48] App. 776.
[49] App. 519.

job responsibilities.[50]  This Court, however, has not done so,[51] and need not do so in this case.  The undisputed evidence shows that Ms. Bradley was not speaking "outside her chain of command" when she was reporting to the EMC on October 29, 2014; rather, she was responding, in her official capacity, to a direct question by a member of that committee.

3.

We have repeatedly noted that "[s]peech involving government impropriety occupies the highest rung of First Amendment protection,"[52] and we take seriously Ms. Bradley's concerns about WCU's budgeting practices. Nevertheless, we are mindful of the Supreme Court's admonition that "while the First Amendment invests public

---

[50] *See, e.g.*, *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013) ("When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties.").

[51] *Cf. Foraker v. Chaffinch*, 501 F.3d 231, 240-41, 243 (3d Cir. 2007) (holding that plaintiffs "were acting within their job duties when they expressed their concerns up the chain of command" and to the State Auditor).

[52] *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005) (citing *Swineford v. Snyder Cty.*, 15 F.3d 1258, 1274 (3d Cir. 1994)); *see also Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014) ("corruption in a public program and misuse of state funds . . . obviously involves a matter of significant public concern").

employees with certain rights, it does not empower them to constitutionalize the employee grievance."[53] Because Ms. Bradley's speech was made as a government employee and not a citizen, she has failed to state a First Amendment claim.[54] Therefore, we uphold the District Court's grant of summary judgment in favor of Mr. Mixner on Count I of her Amended Complaint.

## D.

We turn next to the District Court's determination that PASSHE and WCU are entitled to Eleventh Amendment immunity.

In order to protect States' "solvency and dignity,"[55] the Eleventh Amendment to the United States Constitution has been interpreted by the Supreme Court to shield States and certain State-affiliated entities from suits for damages in federal court.[56] Because of the "sweeping immunity from suit" this Amendment provides, and in order to "ensure that [the

---

[53] *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) (internal quotation marks and citation omitted).

[54] Because we conclude that there was no First Amendment violation, we need not reach the qualified immunity issue. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009).

[55] *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 53 (1994).

[56] *See, e.g.*, *Hans v. Louisiana*, 134 U.S. 1 (1890); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996); *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 83 (3d Cir. 2016).

Amendment's] reach does not extend beyond proper bounds," this Court has developed a "fact-intensive, three-step balancing test to ascertain whether a [S]tate-affiliated entity is an 'arm of the State' that falls within the ambit of [that] Amendment."[57]

Here, the District Court, relying on our 1987 decision in *Skehan v. State System of Higher Education* ("*Skehan II*"),[58] held that PASSHE and WCU were entitled to Eleventh Amendment immunity and dismissed Ms. Bradley's § 1983 claim against those defendants. In this Court, Ms. Bradley points to our 2008 decision in *Cooper v. Southeastern Pennsylvania Transportation Authority*,[59] where we noted that "the Supreme Court has refined its Eleventh Amendment jurisprudence" since the early 1990s, and that we therefore "have modified our own jurisprudence to reflect direction" from that Court.[60] Correspondingly, she invites us to perform a "fresh analysis" of PASSHE and WCU's status under the Eleventh Amendment.[61]

We accept Ms. Bradley's invitation,[62] but come to the same conclusion we reached 30 years ago in *Skehan II*. Under our current jurisprudence, and under the current legal and

---

[57] *Maliandi*, 845 F.3d at 83.

[58] 815 F.2d 244 (3d Cir. 1987).

[59] 548 F.3d 296 (3d Cir. 2008).

[60] *Id.* at 299.

[61] Appellant's Brief at 27 (citing *Maliandi*, 845 F.3d at 84).

[62] *See Karns v. Shanahan*, Nos. 16-2171, 16-2172, slip op. at 11-14 (3d Cir. Jan. 11, 2018) (reexamining the *Fitchik* factors as applied to the New Jersey Transit Corporation).

20

practical realities of those institutions, both PASSHE and WCU are entitled to Eleventh Amendment immunity and are thus not subject to suits for damages in federal court. We therefore uphold the District Court's dismissal of the § 1983 claim against those institutions.

1.

As noted *supra*, this Court considers three factors when determining if a State-affiliated entity is an "arm of the State" entitled to Eleventh Amendment immunity.[63] Known as the "*Fitchik* factors,"[64] they are: (1) whether the money that would pay any judgment would come from the state; (2) the status of the agency under state law; and (3) the degree of autonomy possessed by the agency.[65] At one point, our jurisprudence gave the first factor—the "funding factor"—more "weight" than the other factors.[66] In light of the Supreme Court's decision in *Regents of the University of California v. Doe*,[67] however, we "recalibrated" the factors' weight, and "now treat

---

[63] *Maliandi*, 845 F.3d at 83.

[64] *See Fitchik v. N.J. Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989) (en banc) (consolidating the earlier, nine-factor test of *Urbano v. Bd. of Managers*, 415 F.2d 247 (3d Cir. 1969)).

[65] *Cooper*, 548 F.3d at 299 n.4.

[66] *Maliandi*, 845 F.3d at 84.

[67] 519 U.S. 425, 431 (1997) (noting that an Eleventh Amendment analysis should not be "convert[ed] . . . into a formalistic question of ultimate financial liability").

all three *Fitchik* factors as co-equals, with the funding factor breaking the tie in a close case."[68]

The defendants concede that the funding factor weighs in Ms. Bradley's favor since Pennsylvania law shields the Commonwealth's treasury from PASSHE and WCU's liabilities[69] and since both institutions have revenue sources other than state appropriations from which to satisfy adverse judgments. Additionally, Ms. Bradley notes—and the defendants agree—that both PASSHE and WCU receive a far smaller amount of their budget from the Commonwealth than they did at the time *Skehan II* was decided. Although she argues that that fact strengthens the force with which the funding factor weighs in her favor, our "recalibration" of the balance among the *Fitchik* factors perhaps negates the effect of that budgetary change. Be that as it may, this factor weighs

---

[68] *Maliandi*, 845 F.3d at 84 (citing *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239-40 (3d Cir. 2005)); *see also Karns v. Shanahan*, Nos. 16-2171, 16-2172, slip op. at 11 (3d Cir. Jan. 11, 2018) ("[E]ach case must be considered on its own terms, with courts determining and then weighing the qualitative strength of each individual [*Fitchik*] factor in the unique factual circumstances at issue.").

[69] *See* 24 P.S. § 20-2003-A(b)(3) ("[T]he system shall have no power at any time or in any manner, to pledge the credit or taxing power of the Commonwealth, nor shall any of its obligations or debts be deemed to be obligations of the Commonwealth, nor shall the Commonwealth be liable for the payment of principal or interest on such obligations.").

decidedly against granting Eleventh Amendment immunity to PASSHE and its universities.

2.

The second *Fitchik* factor—status under state law—"requires that we focus on whether the State itself considers the entity [under consideration] an arm of the [S]tate."[70] Under this factor, we consider "how state law treats the agency generally" by looking to "(1) explicit statutory indications about how an entity should be regarded; (2) case law from the state courts—especially the state supreme court—regarding an entity's immunity or status as an arm of the State; and (3) whether the entity is subject to laws for which the State itself has waived its own immunity (such as state tort claims acts)."[71] We also consider "whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, . . . whether it is immune from state taxation[,]" whether it can "exercise the power of eminent domain," whether it is subject to "state administrative procedure and civil service laws," whether it can "enter contracts and make purchases on its own behalf, and whether the entity owns real estate."[72] Although we have acknowledged that our analysis of this factor is "multifaceted" and can become "hopelessly checkered,"[73] we believe that Pennsylvania law consistently treats PASSHE and its universities as arms of the state, and that

---

[70] *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 548 (3d Cir. 2007).

[71] *Maliandi*, 845 F.3d at 91.

[72] *Id.*

[73] *Id.*

23

this factor, therefore, weighs in favor of granting Eleventh Amendment immunity to those institutions.

Act 188,[74] which created PASSHE in 1982, indicates that PASSHE is "part of the *Commonwealth*'s system of higher education,"[75] even though the act made PASSHE independent of the Pennsylvania Department of Education.[76] Act 188 also indicates that Commonwealth appropriations to PASSHE and its universities are "ordinary expenses of government, requiring only a majority vote of each House of the General Assembly";[77] under the Pennsylvania Constitution, on the other hand, appropriations to schools "not under the *absolute control* of the Commonwealth" require a "vote of two-thirds of all the members elected to each House."[78]

Pennsylvania courts have determined that PASSHE and its universities are "Commonwealth agencies," and therefore part of the "Commonwealth government," for purposes of the Pennsylvania Judicial Code[79] and Administrative Agency

---

[74] 24 P.S. § 20-2001-A *et seq.*

[75] 24 P.S. § 20-2003-A(a) (emphasis added).

[76] 24 P.S. § 20-2002-A(a).

[77] 24 P.S. § 20-2002-A(b).

[78] Pa. Const. art. III § 30 (emphasis added).

[79] *See, e.g.*, *E. Stroudsburg Univ. v. Hubbard*, 591 A.2d 1181, 1184 (Pa. Commw. Ct. 1991). This determination gives the Pennsylvania Commonwealth Court—as opposed to a Court of Common Pleas—original jurisdiction over civil actions filed against PASSHE and its universities. *Id.*; *see also* 42 Pa. Cons. Stat. §§ 102, 761(a).

Law.[80]   Municipalities and local government agencies—on which the Supreme Court has "consistently refused" to confer Eleventh Amendment immunity[81]—are, on the other hand, not considered part of the "Commonwealth government" under either statutory scheme.[82]

Pennsylvania courts have also found that PASSHE and its universities are "Commonwealth parties" under the Pennsylvania Sovereign Immunity Act,[83] which entitles them to share the Commonwealth's sovereign immunity except

---

[80]   *See, e.g.*, *Fisler v. State Sys. of Higher Educ.*, 78 A.3d 30 (Pa. Commw. Ct. 2013).   The Administrative Agency Law specifically exempts "[p]roceedings before [PASSHE] involving student discipline" from its coverage.  2 Pa. Cons. Stat. § 501(b)(4).

[81]   *Lake Country Estate, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979).

[82]   42 Pa. Cons. Stat. §102 (excluding "any political subdivision, municipal or other local authority, or any officer or agency of any such political subdivision or local authority" from the definition of "Commonwealth government" in the Judicial Code); 2 Pa. Cons. Stat. § 101 (same, for purposes of the Administrative Agency Law).

[83]   42 Pa. Cons. Stat. §§ 8521-28; *see, e.g.*, *Armenti v. Pennsylvania State Sys. of Higher Educ.*, 100 A.3d 772, 777 (Pa. Commw. Ct. 2014); *Poliskiewicz v. E. Stroudsburg Univ.*, 536 A.2d 472, 474 (Pa. Commw. Ct. 1988).

where waived for certain claims in state courts.[84] Municipalities and local government agencies do not share that sovereign immunity; instead, they have limited "governmental immunity" under the Pennsylvania Subdivision Tort Claims Act.[85]

PASSHE and its universities are also subject to state administrative procedure laws. Under the Pennsylvania Commonwealth Documents Law, for example, their proposed regulations must go through a notice and comment process.[86] Under the Regulatory Review Act, those regulations must be submitted, along with a thorough analysis, to the Independent Regulatory Review Commission.[87] And under the

---

[84] 42 Pa. Cons. Stat. § 8522; *see also* 42 Pa. Cons. Stat. § 8528(a) (limiting damages which may be recovered from "Commonwealth parties" in claims where those parties' sovereign immunity has been waived).

[85] 42 Pa. Cons. Stat. § 8541-64; *see Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 548 (3d Cir. 2007) (noting that a similar distinction between the immunity granted to University of Iowa and the immunity granted to political subdivisions in Iowa weighed in favor of finding that the university was considered an arm of the State); *cf. Maliandi v. Montclair State Univ.*, 845 F.3d 77, 93 (3d Cir. 2016) (noting that Montclair State University was covered by the same Tort Claims Act as New Jersey municipalities and counties, "undercutting the inference that entities subject to this Act are otherwise immune from suit").

[86] 45 P.S. §§ 1201-02.

[87] 71 P.S. § 745.5.

Commonwealth Attorneys Act, the regulations must be submitted to both the state Attorney General and the Governor's General Counsel, where they are reviewed "for form and legality."[88]

PASSHE is separately incorporated,[89] which weighs against a finding that it is an arm of the State. There is also no apparent indication that PASSHE or its universities can exercise the power of eminent domain or that they are subject to civil service laws. Other considerations cut both ways: It appears, for example, that PASSHE and its universities can sue and be sued in their own right, although they may be represented in litigation by either the Pennsylvania Attorney General (as was done in this case) or by the Governor's General Counsel.[90] It also appears that real property owned by PASSHE and its universities is generally immune from state taxation,[91] although it may be subject to local taxation when it

---

[88] 71 P.S. §§ 732-204(b), 732-301(10).

[89] 24 P.S. § 20-2003-A(b)(1) (granting PASSHE the "right and power[ t]o have perpetual existence as a corporation").

[90] 71 P.S. § 732-204(c); *cf. Bowers*, 475 F.3d at 548 (noting, before finding that the University of Iowa is considered an arm of the State of Iowa, that "although the University may bring suit in its own name, it may do so only through the State Attorney General's Office, which also is obligated to defend the University from suit").

[91] *Cf. Pa. State Univ. v. Derry Twp. Sch. Dist.*, 731 A.2d 1272, 1275 (Pa. 1999) (suggesting that PASSHE

is not used consistently with its governmental purpose.[92] And although PASSHE and its universities have the power to enter into contracts and make purchases on their own behalf, and can acquire and own their own real estate, those powers are constrained in several ways, which are discussed *infra*.

The balance of considerations under this "status under state law" factor weighs in favor of finding that Pennsylvania treats PASSHE and its universities as arms of the state. Statutory and case law consistently treats these institutions as it treats the state government itself, and contrary considerations (*e.g.*, separate incorporation, ability to sue in their own name) arguably deal more with form than with function. This factor, then, weighs strongly in favor of Eleventh Amendment immunity.

---

universities' real property is exempt from real estate taxes).

[92] *See, e.g.*, *Ind. Univ. of Pa. v. Ind. Cty. Bd. of Assessment Appeals*, 2015 WL 5671153, at *1, *8 (Pa. Commw. Ct. 2015) (unpublished decision) (affirming order overruling PASSHE university's appeal of determination that a portion of its real property, which it had leased "for a private or commercial purpose," was taxable); *Pa. State Sys. of Higher Educ. v. Ind. Area Sch. Dist.*, 2012 WL 8667893, at *1, *6-8 (Pa. Commw. Ct. 2012) (unpublished decision) (presumption of immunity from taxation was overcome to the extent that PASSHE university leased property for rental income rather than using it for educational purposes).

3.

The third *Fitchik* factor—the autonomy factor—focuses on "the entity's governing structure and the oversight and control exerted by a State's governor and legislature."[93] Our analysis of this factor leads us to conclude, as we did in *Skehan II*, that PASSHE and its universities are "not autonomous but subject to substantial state supervision and control,"[94] and that, therefore, this factor weighs in favor of Eleventh Amendment immunity.

a.

The governing structure of PASSHE and its universities places significant constraints on those institutions' autonomy. PASSHE is governed by, and its powers are exercised through, a Board of Governors ("BOG").[95] The BOG consists of twenty members: the Governor, the State Secretary of Education, four members of the General Assembly, and fourteen members appointed by the Governor with the advice and consent of the State Senate.[96] Of these Governor-appointed members, three must be PASSHE university students. The Governor and Secretary of Education serve on the BOG as long as they remain in office; the General Assembly members' terms coincide with their elective terms; the student members serve until graduation; and the other appointed members serve four-

---

[93] *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 96 (3d Cir. 2016).

[94] *Skehan v. State Sys. of Higher Educ.*, 815 F.2d 244, 248 (3d Cir. 1987).

[95] 24 P.S. § 20-2004-A(a).

[96] *Id.*

year terms.[97]  The BOG employs, as "chief executive officer" of PASSHE, a Chancellor who serves "at the [BOG]'s pleasure."[98]

PASSHE universities themselves are each headed by a separate Council of Trustees ("COT").[99]  Each COT consists of eleven members, one of whom must be a full-time undergraduate student.[100]  Each COT member is appointed by the Governor, and all except for the student member require State Senate confirmation.[101]  The student member serves for a maximum of four years; the other members serve six-year terms.[102]  The BOG appoints, as "chief executive officer" of each PASSHE university, a president who, like the Chancellor, serves "at the [BOG]'s pleasure."[103]

In *Bowers v. National Collegiate Athletic Ass'n*, we held that the University of Iowa was entitled to Eleventh Amendment immunity after noting that all members of its Board of Regents were appointed by the Governor.[104]  We came to the same conclusion in *Maliandi v. Montclair State University* after similarly noting that all members of

---

[97]  *Id.*

[98]  24 P.S. §§ 20-2005-A, 20-2006-A(a)(1).

[99]  24 P.S. § 20-2008-A.

[100]  24 P.S. § 20-2008-A(b).

[101]  24 P.S. § 20-2008-A(a),(b).

[102]  24 P.S. § 20-2008-A(b).

[103]  24 P.S. §§ 20-2006-A(a), 20-2010-A.

[104]  *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 548-49 (3d Cir. 2007).

Montclair's Board of Trustees were Governor-appointed.[105] We came to the *opposite* conclusion in *Kovats v. Rutgers*, denying Eleventh Amendment immunity to Rutgers after noting that only a "bare minimum" of its Board of Governors, and less than half of its Board of Trustees, were Governor-appointed.[106]

Here, all members of the BOG and the COTs are Governor-appointed. It is true that, in *Bowers* and *Maliandi*, we noted that Board members were removable by their respective Governors "for cause,"[107] and that there is no similar provision in Act 188 vis-à-vis members of PASSHE's BOG or its universities' COTs. It appears, however, that such members may be removed by the Governor *at will*,[108] reducing those

---

[105] *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 98 (3d Cir. 2016).

[106] *Kovats v. Rutgers*, 822 F.2d 1303, 1311-12 (3d Cir. 1987).

[107] *Bowers*, 475 F.3d at 549; *Maliandi*, 845 F.3d at 97-98.

[108] *See* Pa. Const. art. VI § 7 ("Appointed civil officers, other than judges of the courts of record, may be removed at the pleasure of the power by which they shall have been appointed."); *Naef v. City of Allentown*, 227 A.2d 888, 889 (Pa. 1967) ("In a multitude of decisions, this Court has ruled that, under the above constitutional provision, appointed public officers are removable from office at the pleasure of the appointive power even though the appointments were made for a statutorily fixed term."). The General Assembly may limit this constitutional removal power expressly, and the Pennsylvania Supreme Court has inferred limits on

bodies' autonomy further than if they were removable only for cause.

b.

There are also statutory barriers around PASSHE and its universities' autonomy. Both the BOG and COT have numerous powers and duties under Act 188, but many of them are limited.[109] For example, as mentioned *supra*, although PASSHE may acquire real property, it must obtain the General Assembly's approval before disposing of that real property.[110] It may enter into collective bargaining agreements with its employees, but must "make a coalition bargaining arrangement with the Commonwealth" when it negotiates with noninstructional employees.[111] It may enter into contracts for construction, repair, renovation, and maintenance, but when these contracts exceed a threshold amount ($18,500), it must utilize competitive bidding.[112]

---

this power in several cases where officers are appointed to staggered terms. *See, e.g.*, *Bowers v. Pa. Labor Relations Bd.*, 167 A.2d 480, 485 (Pa. 1961); *Watson v. Pa. Tpk. Comm'n*, 125 A.2d 354, 358 (Pa. 1956). Act 188, however, does not create staggered terms for members of the BOG or the COTs; we cannot, therefore, infer a limit on the Governor's power to remove those members.

[109] *See* 24 P.S. §§ 20-2006-A, 20-2010-A.

[110] 24 P.S. §§ 20-2003-A(b)(3), 20-2018-A.

[111] 24 P.S. § 20-2003-A(c).

[112] 24 P.S. § 20-2003-A.1.

Additionally, PASSHE and its universities are, like Montclair, "subject to significant reporting requirements and rules for internal governance."[113] For example, all activities of these institutions are subject to audit by the Commonwealth's Auditor General, and PASSHE must submit annual reports to the General Assembly.[114] Each PASSHE university must submit a thorough annual report to the Department of Education and the Joint State Government Commission, which report "shall include data for all programs of the institution."[115] And, as noted *supra*, PASSHE and its universities are subject to a host of state administrative procedure laws.

Unlike in *Kovats*, where "state intervention . . . is minimal,"[116] there are many "indicia of state control"[117] over PASSHE and its universities, as there were in *Bowers* and *Maliandi*. Combined with the significantly constrained governing structure, these considerations lead us to conclude that PASSHE and its universities maintain only limited autonomy from the state. This factor, then, also weighs strongly in favor of Eleventh Amendment immunity.

---

[113] *See Maliandi v. Montclair State Univ.*, 845 F.3d 77, 98 (3d Cir. 2016).

[114] 24 P.S. § 20-2015-A(a).

[115] 24 P.S. § 20-2017-A(a).

[116] *Kovats v. Rutgers*, 822 F.2d 1303, 1311 (3d Cir. 1987); *see also id.* at 1311-12 (noting that Rutgers is "not subject to the operational constraints placed on most other state agencies," such as the need to "comply with civil service, competitive bidding[,] or administrative procedure requirements").

[117] *Maliandi*, 845 F.3d at 99.

## 4.

We have concluded that two of the three *Fitchik* factors tip strongly towards PASSHE and its universities, including WCU, while one factor weighs against them. After "[w]eighing and balancing the qualitative strength of each factor in the context of the circumstances presented,"[118] we hold that those institutions are entitled to Eleventh Amendment immunity from Ms. Bradley's claims in federal court. As we noted in *Maliandi*, this conclusion may result in "limited and unsatisfying avenues to obtain relief" for litigants like Ms. Bradley.[119] Nevertheless, "comity and state sovereignty are constitutional precepts and lynchpins of our federalist system of government,"[120] and we must, therefore, uphold the District Court's dismissal of Ms. Bradley's § 1983 claims against these institutions.

## III.

Because we find that Ms. Bradley was not speaking as a citizen at the October 29, 2014 EMC meeting, she has no First Amendment claim; therefore, we will affirm the District Court's grant of summary judgment in favor of Mr. Mixner. And because we find that PASSHE and WCU are entitled to Eleventh Amendment immunity, we will affirm the District Court's dismissal of Count I against those defendants.

---

[118] *Karns v. Shanahan*, Nos. 16-2171, 16-2172, slip op. at 21 (3d Cir. Jan. 11, 2018).

[119] *Id.*

[120] *Id.*